# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| EDWIN WOODS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 09-0699-WS-N** |
| | ) | |
| AUSTAL, U.S.A., LLC, | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 29), which has been exhaustively briefed. Also pending are plaintiff's Motion to Strike Defendant's Declarations (doc. 35) and defendant's Motion to Strike or for Extension of Time (doc. 42). All three motions are ripe for disposition.[1]

## I.    Nature of the Case.

Plaintiff, Edwin Woods, is an African-American male who was employed by defendant, Austal, U.S.A., L.L.C., as a pipewelder from August 2007 through May 2008, when Austal terminated his employment. Austal is a shipbuilding company that designs and constructs aluminum commercial and military vessels at its shipyard in Mobile, Alabama.

Based on that nine-month period of employment, Woods filed a Complaint (doc. 1) against Austal in October 2009, alleging claims of race discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. As framed in Woods' summary judgment brief, the causes of action he is pursuing

---

[1]    Plaintiff has requested oral argument. Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument. After careful consideration of the file, the undersigned is of the opinion that oral argument would not be helpful here. The Court already has the benefit of more than 80 pages of briefing by plaintiff concerning the Motion for Summary Judgment and associated motions. The briefing schedule (which allowed plaintiff's principal brief to surpass applicable page limits by some 20 pages) has afforded plaintiff a full and fair opportunity to be heard, and plaintiff's memoranda set forth his position on the Rule 56 and evidentiary issues in extensive detail. Accordingly, plaintiff's request for oral argument is **denied**.

against Austal herein are as follows: (i) racially discriminatory pay; (ii) failure to promote on the basis of race; (iii) failure to train on the basis of race; (iv) racially hostile work environment; and (v) retaliation in job assignments, discipline, recertification testing, and termination.[2] All of his claims are asserted under both Title VII and § 1981.

Austal has now moved for summary judgment on Woods' claims in their entirety. In filing more than 160 pages of briefs and more than 1,500 pages of exhibits on summary judgment-related issues, the parties have demonstrated a fundamental inability to agree on anything, from the proper legal standard to the contents of the record to the propriety of a multitude of exhibits and facts. At the outset, the Court must decide which exhibits are properly in the record before proceeding to the merits of the parties' Rule 56 arguments. Accordingly, the undersigned will first take up the parties' respective Motions to Strike. Once the precise contours of the record have been delineated, the Court will evaluate the parties' specific summary judgment arguments, splitting out facts and arguments on a claim-by-claim basis to minimize the confusion engendered by the sheer volume, breadth and detail of the parties' factual and legal submissions in this single-plaintiff discrimination case.

## II.    Motions to Strike.

### A.    Plaintiff's Motion to Strike.

Plaintiff's Motion to Strike is leveled at some 10 declarations appended as exhibits to defendant's Rule 56 Motion, including those of Randy Morris (doc. 30, Exh. D), Don Keeler (*id.*, Exh. E), Nicholas Cooper (*id.*, Exh. F), Scott Faile (*id.*, Exh. G), Bob Millender (*id.*, Exh. H), Terri Lindley (*id.*, Exh. I), Jamie Williamson (*id.*, Exh. J), Craig Perciavalle (*id.*, Exh. L), Dwain Murphy (*id.*, Exh. M), and Dervin Howard (*id.*, Exh. N).[3] With one exception, plaintiff's sole basis for requesting that all of these declarations be stricken is that Austal failed to disclose these

---

[2]    Plaintiff admits in his summary judgment brief that he "does not make claims for disparate treatment in termination, discipline and suspension," but that these personnel actions are presented solely "as part of his retaliation claim." (Doc. 36, at 31 n.28.) Accordingly, there are no claims joined in this action for race discrimination as to Woods' discipline, termination or welder certifications.

[3]    The declarations of Morris, Keeler, Cooper, Lindley, and Perciavalle were executed on December 20, 2010. Those of Faile, Millender, and Williamson were executed on December 16, 2010. The Howard Declaration was executed on December 9, 2010, and Murphy's was executed on November 22, 2010.

witnesses or their written statements in a timely manner, as required under (i) the disclosure and supplementation requirements of Rule 26, and (ii) an interrogatory ("Interrogatory #8") in which plaintiff requested information as to the substance of all communications between defense counsel and any person concerning allegations of the Complaint. Plaintiff additionally argues that the Keeler Declaration should be stricken for lack of personal knowledge.

With respect to Interrogatory #8, plaintiff's Motion to Strike is much ado about nothing. In the first place, plaintiff does not suggest that defendant's initial work-product objection to his attempts to gain immediate access to all communications between defendant's attorneys and witnesses was improper or unwarranted. *See generally* Rule 26(b)(3)(A), Fed.R.Civ.P.; *Hickman v. Taylor*, 329 U.S. 495, 511-13, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In the second place, plaintiff identifies no authority for the proposition that he was entitled to a "free preview" of defendant's summary judgment witness declarations before the close of discovery.[4] In the third place, it is undisputed that all 10 declarations were executed <u>after</u> the October 29, 2010 discovery deadline, and that defendant promptly furnished each of them to plaintiff within days after it was signed.[5] While plaintiff may wish that defendant had collected signed summary judgment

---

[4] Nearly every brief in support of or in opposition to a motion for summary judgment filed in this District Court relies on affidavits or declarations signed within days of that filing. If plaintiff's argument were correct, then all of these federal litigants flout the Federal Rules of Civil Procedure, and all declarations should be stricken unless they were executed prior to the discovery deadline and shared with opposing counsel at that time. This is not how Rule 26 works.

[5] Plaintiff admits as much, stating that "[t]he first declaration was not signed until … three weeks after the close of discovery in this case." (Doc. 35, at 3.) Although plaintiff characterizes as "troubling" defendant's failure to disclose these 10 declarations prior to the November 29, 2010 amended discovery cut-off date, this insinuation of nefarious conduct flirts with absurdity. Only one declaration was executed prior to November 29, 2010, and plaintiff's exhibits confirm that defendant furnished that declaration to plaintiff just 9 days after it was executed. (Doc. 35, Exh. D.) There is nothing "troubling" about defendant not giving plaintiff's counsel copies of declarations prior to the time that such declarations came into existence. The same goes for plaintiff's oft-repeated assertion that Austal violated Rule 26 by "fail[ing] to produce these declarations … *during the discovery process*." (Doc. 35, at 9; doc. 49, at 10.) Again, these declarations did not come into being until <u>after</u> the discovery process had concluded, so defendant could not possibly have violated Rule 26 by failing to disclose them <u>during</u> that process. Nor is it in any way "troubling" that defendant produced copies of various declarations to plaintiff between 0 and 9 days after they were signed, rather than doing so instantaneously. The Court is aware of no rule (and plaintiff has cited none) obliging a party to (Continued)

declarations from all witnesses in advance of the discovery deadline, which was two months before the dispositive motions deadline, the Court is aware of no legal principle that obliged defendant to finalize all declarations in a timeframe that maximized plaintiff's convenience. Nor is there any rule or legal principle mandating that declarations be stricken from a summary judgment record unless they were prepared, executed and produced to opposing counsel before the close of discovery. Insofar, then, as plaintiff's Motion to Strike is predicated on defendant's alleged failure timely to comply with Interrogatory #8, that Motion is **denied**.

The more interesting question is whether these 10 declarations should be stricken for failure to comport with the witness disclosure and supplementation requirements of Rules 26(a) and (e). Plaintiff's own exhibit demonstrates that Austal disclosed witnesses Cooper, Morris and Perciavalle in initial disclosures dated January 25, 2010. (Doc. 35, Exh. A, at § I.)[6] Accordingly, the Motion to Strike is **denied** as to those three witnesses' declarations.

With respect to witnesses Millender, Howard and Murphy, defendant states (without objection) that plaintiff disclosed all three of these individuals as potential witnesses in his disclosures and discovery responses. Thus, it is uncontroverted that Woods knew all along of both the existence of these witnesses and the likelihood that they possessed discoverable information. Any failure by Austal to disclose these witnesses in a timely manner was obviously harmless, given plaintiff's admitted awareness from the inception of the case that they likely have discoverable information. The Motion to Strike is therefore **denied** as to the declarations of Millender, Howard and Murphy. *See* Rule 37(c)(1), Fed.R.Civ.P. (providing that if a party fails

---

turn over all documents to opposing counsel before the ink is dry on the signature page. And plaintiff undermines his own credibility by balking that defendant "failed to even produce some of the declarations prior to attaching them to their summary judgment motion." (Doc. 35, at 3 n.2.) Plaintiff neglects to mention that those particular declarations were executed on the very day that the summary judgment motion was filed, such that plaintiff received them on the same day they were signed. Plaintiff's misguided suggestion that this somehow amounts to undue delay or disregard of supplementation obligations does not stand up to scrutiny.

[6]     Despite defendants' prompt and timely disclosure of them, plaintiff apparently never attempted to depose these three witnesses during the discovery period. (*See* doc. 24, ¶ 3.) As such, Woods' protestation that he now needs "an adequate opportunity to oppose these declarations through discovery" (doc. 35, at 9) is disingenuous. He already had, and squandered, just such an opportunity.

timely to identify witness under Rule 26(a) or 26(e), "the party is not allowed to use that … witness to supply evidence on a motion … unless the failure was substantially justified or harmless").

Austal disclosed witnesses Faile and Williamson to plaintiff via Supplemental Disclosures dated October 29, 2010, which was the date on which discovery closed (save for the limited extension granted by the Magistrate Judge to facilitate a single deposition that had been postponed due to illness). (Doc. 45, Exh. A.)[7] Defendant explains that it did not learn that these individuals had discoverable information until depositions held on October 26, 2010 (when plaintiff attributed certain statements to Williamson) and October 27, 2010 (when Faile's identity was first discovered during Austal's Rule 30(b)(6) witness deposition).[8] Plaintiff accuses Austal of lying about its lack of knowledge of Faile, but proffers no evidence or argument tending to show Austal's awareness of Faile's witness status prior to October 27, 2010. And the record shows that plaintiff knew all along that Williamson possessed discoverable information concerning the noose incident (which is the only topic addressed in his declaration); therefore, any delay in defendant's disclosure of Williamson as a witness is harmless.[9] The Motion to Strike is **denied** as to the Faile and Williamson declarations.[10]

---

[7]     Inexplicably, plaintiff argues that "Defendant did not list Faile … and Williamson as persons with knowledge of facts discoverable in this case in its Rule 26 disclosures or in response to discovery requests." (Doc. 35, at 3.) This assertion is simply counterfactual.

[8]     That witness's deposition included a colloquy in which he was asked to identify an employee who raised a question about whether Woods had properly performed a welding test. The witness responded, "Again, I don't know that," and "That's the problem, I don't recall the individual's name." (Doc. 45, Exh. B, at 177-78.) The record reflects that, after making calls during a break in the deposition, the witness ascertained and disclosed that Failes was the person in question. (*Id.* at 178.)

[9]     As plaintiff admits, "Williamson was apparently the employee right there with Woods when he complained" about the noose incident. (Doc. 49, at 6.) If Williamson was "right there with Woods," then surely Woods knew that. Indeed, Woods so testified in his deposition. Thus, plaintiff had specific knowledge from the outset of this case that Williamson possessed discoverable information pertaining to the noose incident. Even assuming that Austal could have disclosed him sooner, any such delay was harmless.

[10]     As an aside, the Court notes that these kinds of eleventh-hour disclosures are to be expected where, as here, the parties waited until the last possible minute before conducting significant portions of discovery. It is entirely commonplace that discovery depositions turn up
(Continued)

Next is plaintiff's objection to the Terri Lindley Declaration, a very short document confirming the spelling of employee Dervin Howard's name, synopsizing Austal's records concerning employee Jerome Burton, and discussing Austal's graffiti policies.  (Doc. 30, Exh. I.)  Plaintiff is correct that Lindley was not timely, properly disclosed by Austal.[11]  But the nondisclosure was harmless.  Plaintiff was well acquainted with Lindley and was well aware at all relevant times that she likely possessed discoverable information in this matter.  In particular, Woods' counsel took Lindley's deposition twice (on December 16, 2009 and May 11, 2010) in a related race discrimination lawsuit pending in this District Court and styled *Earaton Adams, et al. v. Austal, U.S.A., L.L.C.*, Civil Action 08-0155-KD-M (the "*Adams* Litigation").  Plaintiff's summary judgment submission includes more than 20 pages culled from the Lindley deposition transcripts as to, *inter alia*, Austal's policies and practices concerning racist graffiti.  (Doc. 37, Exhs. Y & Z.)  Moreover, plaintiff readily admits that he learned from other depositions in this case that "Lindley and O'Dell were the most knowledgeable [Austal officials] regarding several of Wood's [*sic*] claims."  (Doc. 49, at 5 n.4.)  Thus, plaintiff had actual knowledge of Lindley's status as a person with discoverable information prior to the close of discovery in this case.  And plaintiff enjoys the benefit of his counsel having deposed Lindley twice in a related matter, including examination on the key issue presented in her declaration in this case.  Accordingly, Austal's failure to disclose Lindley as a witness was harmless, and exclusion of her affidavit is not warranted under Rule 37(c)(1).  The Motion to Strike is **denied** as to the Lindley Declaration.

---

new names of heretofore-unrecognized or -unheralded witnesses.  If the parties elect to wait until the eve of the discovery deadline before conducting depositions, they do so at the risk of not being able to follow up after that deadline.  Plaintiff's Motion to Strike is in derogation of his responsibility for the consequences of that last-minute discovery barrage.

[11]    Austal attempts unsuccessfully to show that Lindley was disclosed.  In particular, Austal points to an interrogatory response in which it identified Lindley as one of two employees who generally "assisted" defense counsel in "compil[ing]" interrogatory responses, coupled with a generic catch-all provision on October 29, 2010 in which Austal purported to disclose "[a]ny and all witnesses listed in … Defendant's discovery responses."  (Doc. 35, Exh. C, at #1; doc. 45, Exh. A, at ¶ 1(c).)  Nothing in these documents would reasonably place plaintiff on notice that Lindley is likely to possess discoverable information.  Defendant's strained contention to the contrary is not persuasive.

Finally, with respect to Don Keeler, plaintiff cannot plausibly suggest that he was never identified as a witness with discoverable information. After all, Austal designated him as its Rule 30(b)(6) witness in this case, and plaintiff deposed him. (Doc. 37, Exh. AA.) Even if plaintiff could somehow fashion a viable failure-to-disclose argument concerning Keeler, any such failure would be harmless given that plaintiff had and availed himself of the opportunity to take Keeler's deposition at great length.[12]

Rather than an unfounded disclosure issue, the focal point of plaintiff's objection to the Keeler Declaration is that it flunks the Rule 56 requirement that the declarant have personal knowledge of the matters set forth therein. *See* Rule 56(c)(4), Fed.R.Civ.P. ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge ….");[13] *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) ("Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge.") (citation omitted); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210 (11th Cir. 2000) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.") (citation omitted). Much of the Keeler Declaration consists of him authenticating certain Austal business records. There is no reason to believe, and plaintiff does not contend, that Keeler is not qualified to do so. Other aspects of the Keeler Declaration are properly couched as addressing present-day Austal policies, and events occurring at Austal after Keeler began working there, as to which he would logically be expected to have personal knowledge. As to those matters, plaintiff's objection on Rule 56(c)(4) grounds is **overruled**.

But the Keeler Declaration also includes averments concerning (i) Woods' previous pipewelding skills and experience, and the reasons why Austal hired him into that job classification in August 2007 (Doc. 30, Exh. E, ¶ 2); (ii) which pipewelders were paid the most when Woods was hired, and what race they were (*id.*); (iii) a pay raise given to Woods in April

---

[12] The transcript of Keeler's deposition runs some 298 pages. (Doc. 30, Exh. B.) Thus, any contention by plaintiff that he did not get a full and fair opportunity to take Keeler's deposition would be unfounded on its face.

[13] Plaintiff frames this objection as being brought pursuant to Rule 56(e) of the Federal Rules of Civil Procedure. But he cites the wrong subsection, based on the Rule 56 amendments that took effect on December 1, 2010, nearly three weeks before defendant filed its Motion for Summary Judgment.

2008 (*id.*, ¶ 4); (iv) his interpretation of an August 2007 Change of Status Form, and the reason Austal filled it out that way (*id.*, ¶ 6); and (v) whether Daughtry supervised Woods after December 2007 (*id.*, ¶ 7). Keeler did not begin working for Austal until April 2009, long after these events occurred. (Doc. 35, Exh. H, at 10.) As such, he could not reasonably have personal knowledge of those particular facts. Plaintiff's Motion to Strike is **granted** as to these aspects of the Keeler Declaration. The following portions of that exhibit are **stricken** for non-compliance with the "personal knowledge" requirement of Rule 56(c)(4): all of Paragraph 2, the last sentence of Paragraph 4, all of Paragraph 6 save the first sentence, and the second sentence of Paragraph 7.[14]

In short, plaintiff's Motion to Strike (doc. 35) is **denied** in its entirety, except that it is **granted** with respect to the enumerated portions of the Don Keeler Declaration (doc. 30, Exh. E) which are not based on personal knowledge, and therefore run afoul of Rule 56(c)(4).

### B. Defendant's Motion to Strike.

Defendant's Motion to Strike (doc. 42) is focused on a single narrow issue, to-wit: The 19 comparators that Woods has identified to bolster his pay discrimination claim. In particular, plaintiff's summary judgment brief recites 19 white Austal employees (and relevant wage information for each) whom he contends received higher pay, all in support of his racially disparate pay claim. (Doc. 36, at 15-19.)[15] To document each comparator's pay, Woods refers

---

[14] In so concluding, the undersigned has considered Austal's arguments in opposition to the Motion to Strike. Defendant says that Keeler was exempt from the "personal knowledge" requirement because he was deposed as a 30(b)(6) witness. Even assuming that defendant is correct that the "personal knowledge" aspect of Rule 56(c)(4) is suspended as to a 30(b)(6) declarant (and even if Rule 30(b)(6) applied to declarations rather than depositions), the Keeler Declaration does not purport to be a statement on behalf of Austal generally. Rather, Keeler specifically avers that he has "personal knowledge of the facts stated herein." (Doc. 30, Exh. E, at 1.) That statement cannot possibly be accurate, for the reasons set forth *supra*. Defendant's alternative argument that much of Keeler's Declaration statements are already in the record fares no better. That the record may already contain certain information set forth in Keeler's Declaration does not excuse that declaration from compliance with Rule 56(c)(4) or otherwise suggest that the Federal Rules of Civil Procedure may be ignored as to it.

[15] Those individuals are Ryan Schlieper, Jason Finley, William R. Blake, Travis L. Booker, William J. Brown, Jeffrey P. Deakle, Marty S. Drake, Mark A. Ellison, Brandy E. Gates, Roderick D. Gray, Daniel L. Henderson, Gary L. Hilburn, Michael D. Martin, Jr., Randall L. McCall, Robert J. Walser, Jr., John Watkins, Mark E. Rowell, Sherwood T. Boyington, and Risto Gostovac.

to Exhibit I, a 41-page spreadsheet (filed under seal at doc. 56) containing payroll and race data for hundreds of Austal employees at various points in time.  The parties agree that Austal produced Exhibit I to plaintiff's counsel in the related *Adams* Litigation, but that plaintiff never furnished a copy of Exhibit I to Austal in this case, or expressly notified Austal of his intent to utilize that document in furtherance of his pay discrimination claims.  The parties also agree that Austal first learned that Woods intended to rely on these specific 19 comparators when it received Woods' brief in opposition to the Rule 56 Motion.  From Austal's standpoint, this revelation blindsided it.  The premise of Austal's request for summary judgment on the pay discrimination claim was that "Woods has never identified a white employee who was [similarly situated to him] … who was paid more than he."  (Doc. 30, at 21.)  The only potential comparators as to the pay claim that Austal addressed in its principal brief (based on information previously supplied by Woods) were Jay Burton and Michael Martin.  (*Id.* at 21-22.)

In nearly 30 pages of briefing on Defendant's Motion to Strike, the parties frame the issue in various ways, with many of them distorting or obscuring the crux of the harm for which that Motion seeks relief.[16]  The nub of the issue – and the only dimension of the Motion to Strike that merits serious consideration – is this:  Austal asked plaintiff repeatedly during discovery to identify who his comparators were for purposes of the wage discrimination claim.  Plaintiff never told defendant who they were (other than Burton and Martin) until he filed his summary judgment brief, by which time it was effectively too late for defendant to investigate and formulate an effective Rule 56 argument concerning each newly disclosed comparator.  On that basis, defendant seeks to strike the portion of plaintiff's brief identifying these 19 comparators for the disparate pay claim, as well as Exhibit I from which their pay data was drawn.

The relevant facts are as follows:  Early in the discovery process, defendant propounded interrogatories on plaintiff asking him to "set forth all facts supporting your contention … that you were paid less than similarly situated white employees" and to "identify each and every white employee that you allege … was similarly-situated to you and was paid more … than you."  (Doc. 50, Exh. 1, at Interrogatories #15, #16.)  In responses dated July 6, 2010, plaintiff

---

[16]     It would serve no purpose, and would divert scarce resources from the merits of the Rule 56 Motion, to delineate and knock down each of these straw men or the accompanying rhetoric; therefore, the Court declines to do so.

provided few specifics, reasoning that "Discovery has just begun in this matter and Defendant has yet to respond to Plaintiff's discovery requests seeking the pay records regarding white employees." (*Id.*)  However, plaintiff's responses indicated that "[u]pon receipt and review" of those pay records, "Plaintiff will supplement this Interrogatory with additional information." (*Id.*)[17]  At most, plaintiff's responses identified Burton as a white employee who was paid more than he.

Notwithstanding his assurances, plaintiff never supplemented these interrogatory responses with the names of additional comparators for the pay discrimination claim.  Defense counsel contacted plaintiff's counsel in writing on August 25, 2010, requesting supplementation of this comparator information, and stating that in the absence of same, defense counsel would "presume that the only alleged comparators are Mike Martin and Jay Burton as set forth in his answers."  (Doc. 50, Exh. 2, at 2.)  On September 1, 2010, plaintiff's counsel wrote back, explaining his need to review Austal's pay records, and stating that "at such time that Plaintiff is provided the pay data and information from Defendant, Plaintiff will be in a position to supplement."  (Doc. 50, Exh. 3, at 4.)  On September 8, 2010, defendant's counsel again requested supplementation of plaintiff's responses to Interrogatories #15 and 16, at least insofar as plaintiff intended to rely on comparators other than Burton and Martin in support of his pay discrimination claim.  (Doc. 50, Exh. 4, at 3.)  In that letter, defendant's counsel also questioned plaintiff's counsel's reference to a request for "pay data and information from Defendant," indicated she was not aware of any such request, and asked plaintiff's counsel to "[p]lease identify specifically what pay data you are referring to."  (*Id.*)[18]  There is no indication in the

---

[17]     Of course, irrespective of whether plaintiff volunteered to do so or not, he was under a continuing obligation to supplement his responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Rule 26(e)(1)(A), Fed.R.Civ.P.

[18]     To buttress its position on this latter point, defendant has filed copies of plaintiff's extensive written discovery requests propounded on April 30, 2010.  (Doc. 50, Exh. 5.)  Review of those discovery requests confirms that plaintiff did not formally request in this case that Austal produce pay records for its employees generally; rather, such requests were made only with respect to Woods' own payroll records and those of Mike Martin.  (*Id.*, at Document Requests #1, 29.)  Simply put, the court file does not reveal <u>any</u> "pay data and information" that (Continued)

record that plaintiff's counsel ever enlightened defendant's counsel as to the "pay data" in question.

On October 22, 2010, just days before the close of discovery, plaintiff served 37 pages of supplemental discovery responses on defendant. But no additional detail was provided in those supplemental responses as to the critically important Interrogatories #15 and 16. Plaintiff reiterated now-inaccurate statements that "[d]iscovery has just begun," that "Defendant has yet to respond to Plaintiff's discovery requests seeking the pay records regarding white employees," and that "[u]pon receipt and review, Plaintiff will supplement this Interrogatory with additional information." (Doc. 50, Exh. 10, at Interrogatory #15, #16.) Likewise, plaintiff's supplemental responses mentioned Burton and Martin, but no one else. (*Id.*) By all appearances, then, based on plaintiff's discovery responses, and his failure to respond to specific repeated requests for supplementation if he was claiming anyone other than Burton or Martin as a comparator for his wage discrimination theory, plaintiff's disparate pay claims were focused solely on differences between his pay and that of Burton and Martin, and not any other identifiable employees.[19]

Based on this sequence of events, defendant's distress upon scrolling through a list of well over a dozen newly identified comparators in plaintiff's summary judgment brief is understandable. Austal had asked a proper interrogatory concerning the comparators underlying

_____

Woods had requested from Austal in discovery in this case, aside from payroll records pertaining to plaintiff himself and Martin (one of the two properly identified comparators).

[19]     Strictly speaking, Woods' interrogatory responses identified only Burton as a comparator for this claim. But correspondence between counsel confirms defendant's understanding that plaintiff was also invoking Martin as a comparator. Furthermore, Martin's compensation history and the reasons for same were explored in detail by plaintiff at defendant's Rule 30(b)(6) deposition, such that defendant was plainly on notice that plaintiff viewed Martin as a comparator for his pay claims. For example, at one point, plaintiff's counsel specifically asked the witness about "Mr. Martin versus Mr. Woods" in a line of questioning about pay increases for hourly production employees. (Keeler Dep., at 142.) Elsewhere, plaintiff's counsel indicated, "I am trying to make comparators," in the same breath as a line of questions concerning the pay of Mike Martin, among others. (*Id.* at 201.) Besides, both defendant's principal and reply briefs on summary judgment address the merits of Woods' suggestion that Martin is a valid comparator for his wage discrimination claims. Therefore, the Court will construe Martin as a properly identified comparator and will allow plaintiff to argue on summary judgment that differences between his wages and those of Martin give rise to a jury question as to his Title VII and Section 1981 discriminatory pay cause of action.

his pay discrimination claim.  Woods had provided two names in response and had promised to supplement that list, but then never did, even after Austal followed up multiple times.  By unveiling 19 comparators for the first time in its summary judgment response, plaintiff ambushed defendant, unleashing a host of arguments that defendant could not reasonably have anticipated to be part of plaintiff's case based on his misleading discovery responses.  This sort of sandbagging is not fair and does not comport with the Federal Rules of Civil Procedure.

Plaintiff's three attempts to justify or excuse this conduct by shifting the blame to Austal are unfounded in fact, law or equity.[20]  First, plaintiff suggests that it is defendant's fault that he never supplemented because "Defendant never provided [pay records regarding white employees] even after the parties agreed to limit the discovery to Plaintiff's department."  (Doc. 48, at 6.)  But plaintiff points to no such unanswered discovery request.  As noted *supra*, the Court's own review of plaintiff's discovery requests reveals no items seeking "pay records regarding white employees."  Defendant's counsel asked plaintiff's counsel in writing back in September to identify what unanswered discovery concerning pay he was talking about.  Plaintiff's counsel apparently never responded.  Besides, plaintiff obviously <u>did</u> obtain pay records regarding white employees at some point; otherwise, he never could have generated the list of 19 comparators found in his summary judgment response.

Second, plaintiff  maintains that the problem is one of Austal's creation because "[i]f Defendant was unsatisfied with Plaintiff's responses to its request, it could and should have moved to compel on that issue."  (Doc. 48, at 6 n.5.)  Plaintiff is wrong.  As he has recognized

---

[20]     Woods also mischaracterizes the Motion to Strike by arguing that "Defendant wants to fault Woods for not specifically being able to identify from memory each comparator for his pay claim."  (Doc. 48, at 9.)  As plaintiff well knows, the issue presented in the Motion to Strike is not whether he should have memorized the wages of all of his white co-workers at Austal and generated a detailed comparators list on that basis.  No one is suggesting that.  Rather, the issue is whether – after plaintiff had received the detailed Austal pay spreadsheet at Exhibit I and was fully equipped to identify all 19 comparators set forth in his summary judgment brief – Rule 26 authorized him keep the identities of 18 of them a secret until he filed the brief, thereby maximizing his strategic advantage and winning a game of "gotcha" with defendant, despite specific written discovery requests and follow-up inquiries from defendant calling for that precise information.

elsewhere in this case,[21] the duty of supplementation created by Rule 26(e)(1)(A) is not contingent on opposing counsel filing a motion to compel. And the availability of sanctions delineated in Rule 37(c)(1) for failure to disclose or supplement likewise does not require a motion to compel as a condition precedent. More fundamentally, until it reviewed Woods' summary judgment brief, Austal had no reason to believe that his responses to Interrogatories #15 and 16 were incomplete. After all, plaintiff had named two comparators (Burton and Martin), and had announced his intent to supplement. But he never did supplement. When defendant followed up to ask plaintiff to supplement, he did not do so. From this course of conduct, it was entirely reasonable for defendant to conclude that the two comparators named were the <u>only</u> comparators on which Woods was basing his discriminatory pay claim. Simply put, defendant had no reason to be dissatisfied with plaintiff's discovery responses on this point until plaintiff filed a summary judgment brief that expounded nearly tenfold on that list of comparators.

Third, plaintiff inexplicably asserts that it was defendant's job (not plaintiff's job) to identify the comparators for his pay claim.[22] Apparently, plaintiff would blame defendant for (i) not reading plaintiff's mind as to his anticipated comparators, and (ii) not assuming that Woods intended to argue that <u>every</u> higher-paid white Austal employee was a comparator for purposes of his pay discrimination claim.[23] Austal asked Woods a proper discovery question. Woods

---

[21]     Plaintiff's argument contradicts his own synopsis of the duty of supplementation in his brief in support of his Motion to Strike filed in this very case just three days after his brief on defendant's Motion to Strike. (Doc. 49, at 1-2.) Counsel do not promote their clients' interests, and they waste judicial resources, when they flip-flop on legal principles at the drop of a hat in the same case, based on the expediencies of the moment.

[22]     The precise text of plaintiff's argument is as follows: "[D]efense counsel, had it chose [*sic*] to investigate, could easily determine which employees are comparators by applying the standard applied in this Circuit for comparability in such cases." (Doc. 48, at 6 n.6.)

[23]     This second point is particularly facile. It is true that in a Title VII discriminatory pay context, a plaintiff can satisfy his *prima facie* burden of comparability simply by showing that he "occupies a job similar to that of higher paid" persons outside the protected class. *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citation omitted); *see also Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1186 (11th Cir. 2005) (similar). But that does not mean – as Woods suggests – that a plaintiff's discriminatory pay claim necessarily embraces every higher-paid employee who occupies a similar job, and that a defendant must reflexively litigate the comparability of each and every one of those individuals whenever a Title (Continued)

answered, providing only two names.  When Austal prodded Woods to identify any other comparators, Woods said nothing.  Austal was entitled to rely on those interrogatory responses in fashioning its Rule 56 Motion in this case, and plaintiff cannot subvert the Federal Rules of Civil Procedure and the discovery process by dramatically expanding on that list of comparators in its summary judgment response, when it is too late for Austal to do anything about it.

Based on the foregoing, the Court finds that plaintiff violated Rules 26(a) and/or (e) by failing to disclose the many comparators unveiled in his summary judgment brief.  The only remaining issue is that of remedy, for which the Court looks to Rule 37(c).  *See, e.g., Mee Industries v. Dow Chemical Co.*, 608 F.3d 1202, 1221 (11th Cir. 2010) ("Rule 37(c) of the Federal Rules of Civil Procedure provides for sanctions against a party that fails to disclose information required under Rule 26(a) or (e).").  That rule provides as follows: "If a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Rule 37(c)(1), Fed.R.Civ.P.; *see also Sharpe v. Global Security Int'l*, --- F. Supp.2d ----, 2011 WL 386859, *2 (S.D. Ala. Feb. 2, 2011).  For the reasons set forth *supra*, the Court finds that plaintiff's nondisclosure was neither substantially justified nor harmless.  In the undersigned's view, the proper remedy for plaintiff's breach of his Rule 26 obligations is that he should not be allowed to rely on any of the newly-raised comparators in support of his pay discrimination claim.  Accordingly, all references to comparators other than Mike Martin (who was timely disclosed) are **stricken** from pages 15 through 19 of Plaintiff's

---

VII pay discrimination claim is brought.  After all, in a Title VII pay claim, the plaintiff bears the burden of persuasion that "the employer had a discriminatory intent."  *Meeks*, 15 F.3d at 1019. For many potential comparators as to whom a *prima facie* showing could be made, a Title VII plaintiff could and should discard them because there are obvious nondiscriminatory reasons for the observed pay differential.  It is up to the plaintiff to identify his comparators, and it would be a colossal waste of judicial and litigant resources if a Title VII defendant were required to frame its summary judgment motion on the assumption that everyone paid more than the plaintiff is a comparator who must be analyzed under Title VII.  This point rings particularly true here, where plaintiff's comparators were drawn from an extensive spreadsheet listing literally hundreds of employees.  That is why Austal's Interrogatories #15 and #16 were pertinent and proper, and why plaintiff's argument that Austal should have simply assumed that everyone was a comparator misses the mark.

Opposition to Defendant's Motion for Summary Judgment (doc. 36).  Defendant's Motion to Strike is **granted** as to that issue, but is **denied** in all other respects.[24]

## III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the

---

[24]        In particular, the Motion to Strike is denied insofar as it relates to Exhibit I, the Austal-created spreadsheet documenting names and pay for dozens of Austal employees. Contrary to defendant's argument, there was no sandbagging by plaintiff concerning Exhibit I. This exhibit is an Austal-generated document of whose existence Austal always had actual knowledge.  Accordingly, the Court finds no discovery violation by plaintiff pertaining to Exhibit I, and that document will remain in the summary judgment record, provided, however, that plaintiff cannot rely on it to inject comparators into the case, other than the two he named in his discovery responses.

summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

## IV.  Legal Framework Governing Plaintiff's Disparate Treatment Claims.

As described *supra*, plaintiff's claims (which are brought pursuant to Title VII and § 1981) consist of disparate treatment claims alleging discriminatory pay, promotions and training; a claim alleging a racially hostile work environment; and claims of retaliation as to discipline, job assignments, certifications and termination.[25]  Each claim will be addressed separately; however, the parties' briefs raise common issues concerning the legal standard applicable to all of Woods' disparate treatment claims.  Those issues will be addressed collectively, before turning to the specifics of Woods' disparate treatment claims.

### A.  The McDonnell Douglas Standard.

Absent direct evidence of discrimination or retaliation, Woods must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[26]  Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and/or retaliation.  If he does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).  At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason

---

[25]      The Complaint frames plaintiff's claims under both Title VII & § 1981; however, the same analysis governs both types of statutory claims.  "Because the legal standards governing each of these categories of claims are the same, it is unnecessary to evaluate separately the Title VII … and the Section 1981 causes of action."  *Pears v. Mobile County*, 645 F. Supp.2d 1062, 1089 (S.D. Ala. 2009); *see also Brown v. Alabama Dep't of Transportation*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) ("The analysis under [§ 1981] claims mirrors that under Title VII."); *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994) ("The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in § 1981 cases involving discriminatory treatment in employment situations."); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (for disparate treatment claims under both Title VII and § 1981, "the legal elements of the claims are identical").  This Order will distinguish between the two statutory bases for Woods' claims only insofar as it is relevant to exhaustion or timeliness issues with certain Title VII causes of action.

[26]      In the "mixed-motive" section of his brief, Woods contends that there is direct evidence of race discrimination that removes this case from the circumstantial *McDonnell Douglas* paradigm.  The Court addresses this contention in Section IV.B., *infra*.

for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims). A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007).

### B. Plaintiff's "Mixed-Motive" Contention.

The parties' summary judgment briefs are dominated by application of the traditional *McDonnell Douglas* analysis to Woods' discrimination and retaliation claims. That said, Woods maintains that he is also relying on a "mixed-motive" method of proof. (Doc. 36, at 39-42.)

In mixed-motive cases, the theory of liability is that the employer was motivated by both legitimate and discriminatory motives in making the challenged decisions. *See generally Fogg v. Gonzales*, 492 F.3d 447, 453 (D.C. Cir. 2007) (explaining that "there are alternative ways of establishing liability under Title VII," including mixed-motive and traditional single-motive theories).[27] Under this approach, "once a plaintiff shows that race or sex discrimination was a motivating or substantial factor in an employment decision, the burden of persuasion shifts to the employer to demonstrate by a preponderance of the evidence that the employer would have made the same decision in the absence of the discriminatory motive." *Mora v. Jackson Memorial Foundation, Inc.*, 597 F.3d 1201, 1203 (11th Cir. 2010) (citations omitted). Thus, the first step in a mixed-motive case is for the plaintiff to "present sufficient evidence for a reasonable jury to conclude his race was a motivating factor" in the challenged employment decision. *Lewis v. Metropolitan Atlanta Rapid Transit Authority*, 2009 WL 2599571, *4 (11th Cir. Aug. 25, 2009);

---

[27] As amended in 1991, Title VII specifically provides that "an unlawful employment practice is established when the complaining party demonstrates that race … was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

*see also Rawlinson v. Whitney Nat'l Bank*, 416 F. Supp.2d 1263, 1267 (M.D. Ala. 2005) (mixed-motive analysis begins with examining "whether the plaintiff has proved by a preponderance of the evidence that her race was a motivating factor for the defendant's decision").

The mixed-motive section of plaintiff's brief is somewhat confusing because, for example, he commingles the "pretext" analysis with the "mixed-motive" analysis, even as he simultaneously argues that these are alternative methods of proof. Plaintiff neither recognizes nor rebuts persuasive authority from lower courts in this Circuit that the *McDonnell Douglas* analysis is applicable in all circumstantial cases, regardless of whether they are single-motive or mixed-motive in nature. *See, e.g., Thomas v. Bed Bath & Beyond, Inc.*, 508 F. Supp.2d 1264, 1274 n.10 (N.D. Ga. 2007) ("The traditional *McDonnell Douglas-Burdine* framework is broad enough to encompass a mixed motive claim."); *Herawi v. State of Alabama Dep't of Forensic Sciences*, 311 F. Supp.2d 1335, 1346 (M.D. Ala. 2004) (recognizing "continued usefulness of *McDonnell Douglas* to trial courts, in either single- or mixed-motive cases based on circumstantial evidence, for assessing Title VII liability"). To the extent he does describe the analytical framework, plaintiff cites almost exclusively to Eighth and Fourth Circuit authorities, without aligning these precedents to Eleventh Circuit pronouncements in mixed-motive cases. Most importantly, Woods devotes little attention to explaining how the record establishes sufficient evidence for a reasonable jury to conclude that race was a motivating factor in the challenged decisions. Indeed, the <u>only</u> material way in which he distinguishes his mixed-motive showing from his traditional single-motive showing is by arguing that there is "[s]ubstantial direct evidence of racial animus." (Doc. 36, at 41.)[28]

As defendant aptly points out, however, this is not a direct evidence case. "Direct evidence of discrimination is evidence that, if believed, proves the existence of a fact without inference or presumption." *Dixon v. The Hallmark Companies, Inc.*, 627 F.3d 849, 854 (11th Cir. 2010) (citation and internal quotation marks omitted). "Under Eleventh Circuit law, only the

---

[28] The Supreme Court has determined that "direct evidence of discrimination is not required in mixed-motive cases." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). Nothing herein should be read as implying otherwise. What is important, however, is that Woods has not asserted that the circumstantial evidence in this case satisfies the first step of the mixed-motive analysis. Because plaintiff has elected to couch his "motivating factor" argument exclusively in terms of direct evidence of race discrimination, the Court likewise limits its inquiry in this portion of the analysis to direct evidence.

most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* (citation and internal quotation marks omitted); *see also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (same). "To qualify as direct evidence of discrimination, we require that a biased statement by a decision-maker be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." *Williamson v. Adventist Health System / Sunbelt, Inc.*, 2010 WL 1444574, *3 (11th Cir. Apr. 13, 2010). More broadly, "remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Plaintiff's brief is long on conclusory allegations of "direct evidence of racial animus," but woefully short on specifics. For example, plaintiff simply waves his hand at more than 15 pages of the fact section of his brief, and suggests that unspecified "direct evidence" can be found somewhere in those pages. (Doc. 36, at 41-42.) It is not enough for Woods to state in generic terms that "[s]ubstantial direct evidence of racial animus has been submitted by Woods regarding the decision-makers, Johnson, Daughtry and Morris." (*Id.* at 41.) It is incumbent on him to identify what he believes that direct evidence to be, but instead he points to the record at large and asks this Court to find it for him. That will not do. Given plaintiff's failure of proof on this point, his contention that defendant's Rule 56 Motion should be evaluated on a "direct evidence" analysis cannot prevail.[29]

---

[29] Three other points bear noting here. First, to the extent that Woods founds his direct evidence theory on evidence of a racially hostile environment created by co-workers and non-decisionmakers, or by decisionmakers at a time and place removed from that decision-making process, such an attempt fails as a matter of law. *See Standard*, 161 F.3d at 1330. Second, the few specific citations made by Woods in support of his "direct evidence" theory (*see* doc. 36, at 42) consist of (i) Keeler's testimony concerning the Step Up supervisor system, with supervisors wearing white hats (Keeler Dep., at 88, 91); and (ii) Daughtry's testimony that when pipefitters demonstrated proper skills, he would "evaluate them and suggest that they be given a raise" (Daughtry Dep., at 64). Such evidence is nowhere close to satisfying the stringent legal test for "direct evidence." Third, the Court's independent review of the fact section of plaintiff's brief reveals no direct evidence of discrimination by any decisionmaker. Testimony that plaintiff's supervisor, Daughtry, called him "boy" (Woods Dep., at 43-44) is not direct evidence that Daughtry discriminated against him on the basis of race in raise and promotion decisions, because (i) it requires an inference to arrive at a racially discriminatory meaning for that term; (Continued)

In sum, then, plaintiff has contended that this case should be evaluated on a "mixed motive" theory on summary judgment because he has direct evidence of race discrimination. But Woods has identified no evidence that might satisfy the rigorous requirements for "direct evidence" under Eleventh Circuit law. Accordingly, his claims are properly evaluated on summary judgment using a circumstantial evidence framework. Woods having articulated no argument why a mixed-motive analysis should apply to his circumstantial evidence of race discrimination, there being substantial authority that *McDonnell Douglas* applies to circumstantial mixed-motive cases, and plaintiff not having explained how he thinks the mixed-motive assessment of his claims on summary judgment deviates from the *McDonnell Douglas* framework, this Court will evaluate Austal's Motion for Summary Judgment using the traditional tripartite burden-shifting analysis developed in the *McDonnell Douglas / Burdine* line of cases.[30]

## V. Disparate Pay Claim.

### A. Relevant Facts.

On or about August 6, 2007, Austal hired Woods for the position of Pipewelder at a starting wage of $15.00 per hour. (Woods Dep., at 18 & Exh. 3.) Austal set his wage at $1.00

---

and (ii) in any event those remarks appear divorced from the decisionmaking processes in question. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456, 126 S.Ct. 1195 (2006) (explaining that use of term "boy" by a supervisor "will not always be evidence of racial animus," but may depend on "various factors"). Evidence that when Woods discovered a noose on the premises, another supervisor, Randy Morris, laughed it off and explained that "it wasn't a real noose, because it didn't have thirteen knots" (Woods Dep., at 211) is likewise inadequate. Such evidence may support an inference that Morris was racially insensitive, but it is not direct evidence that any complained-of personnel action was the product of race discrimination. And the Court is at a loss to identify what Woods may be referring to in stating that he has presented "direct evidence of racial animus … regarding … Johnson" (doc. 36, at 42). Nothing that could conceivably satisfy the direct evidence test as to Joe Johnson appears in the fact section of Woods' brief.

[30] Nothing herein forbids or precludes Woods from advancing a mixed-motive theory at trial, or requesting appropriate jury instructions concerning same if the evidence supports it. Rather, the Court simply rules for summary judgment purposes that (i) Woods' mixed-motive argument is predicated solely on direct evidence of discrimination, (ii) he has identified no evidence on summary judgment that satisfies the stringent "direct evidence" test, and (iii) plaintiff has not shown that the traditional *McDonnell Douglas* test is inappropriate for his circumstantial claims, even if he is proceeding on a mixed-motive theory.

higher than the $14.00 per hour that Woods had requested in his employment application. (*Id.* at Exh. 1.)[31] Woods' initial supervisor, Leland Daughtry, testified that this "rate of pay was for a [Trades Assistant] at that time." (Daughtry Dep., at 90, 139.) A reasonable inference from this evidence is that Woods' starting wage was lower than the typical wage for pipewelders at Austal. However, other record evidence clarifies that Woods' starting pay was actually at the "top side" of Austal's pay range for apprentices, and "at the minimum of that range" for welders. (Keeler Dep., at 118.)[32] This testimony clarifies, rather than contradicts, Daughtry's statements, and therefore is accepted for summary judgment purposes.

Woods' hourly wage remained fixed at $15.00 until April 7, 2008, when Austal raised his wage to $18.00 per hour. (Doc. 30, Exh. F, at ¶ 2 & Exh. 1; doc. 30, Exh. D, at ¶ 7 & Exh. 1.)[33] The internal Austal document confirming Woods' pay increases stated in the section labeled "Reason for action" the following: "Edwin Woods has meet [*sic*] the requirements of passing his restricted welding tests. Requested by his management + supervision." (Dock. 30, Exh. D, at Exh. 1.) Woods' wage did not change again prior to his discharge in May 2008.

The only properly identified comparator that plaintiff has discussed on summary judgment is Mike Martin.[34] Record evidence shows that Austal hired Martin (who is white) as a Trades Assistant on February 19, 2007, at an hourly wage of $13.50. (Keeler Dep., at 201 &

---

[31] Austal's evidence is that initial compensation levels for its employees are determined based on the employee's skills, experience, and background, with some consideration also being given to the salary requested. (Keeler Dep., at 120.)

[32] During the time of Woods' employment, Austal had established pay ranges for particular job classifications in particular departments. (Doc. 30, Exh. E, at ¶ 3 & Exh. 1.)

[33] There is evidence that Austal had submitted a Change of Status form for Woods on February 5, 2008 for a pay increase. (Plaintiff's Exh. P.) However, the parties have not shown why the pay increase did not go through at that time or who made that decision. There is no indication that the February 5 form has any bearing on plaintiff's Title VII pay discrimination cause of action.

[34] As mentioned *supra*, plaintiff's discovery responses also identified Jay Burton as a similarly situated white employee who was paid more than he was. However, plaintiff's brief makes no reference to Burton in the context of his pay discrimination claims. Because Woods has not proffered Burton as a comparator on summary judgment, the Court need not consider Burton's compensation, skills or work history.

Exh. 11.)  Martin's employment application reflected no prior welding experience; rather, his background was in the areas of automotive repair and tire technician.  (*Id.* at Exh. 12.)  Nonetheless, Martin advanced rapidly at Austal, and received multiple pay increases along the way.  On June 18, 2007, Austal raised his pay to $15.00 per hour, for the stated reason that "Employee has displayed a great work ethic and an uncanny ability to learn very quickly.  He also has a lot of potential and is great to work with."  (*Id.* at Exh. 14.)   In September 2007, Austal changed Martin's job title from Trades Assistant to Pipewelder, and increased his pay to $17.00 per hour.  (*Id.* at Exh. 9.)  Martin subsequently received several further raises, to $18.00 in October 2007, to $20.00 per hour in February 2008, and to $20.60 per hour in June 2008.  (Doc. 56, at 22.)   In Austal's view, Martin was "a very, very strong learner, learned very quickly."  (*Id.* at 139.)  Austal also perceived that Martin "demonstrated performance and skills and developed at a very, very fast pace."  (*Id.* at 201.)

>     **B.      *Analysis.***

To establish a *prima facie* case of intentional discrimination in compensation, Woods must establish that: (i) he belongs to a racial minority; (ii) he received low wages; (iii) similarly situated comparators outside the protected class received higher compensation; and (iv) he was qualified to receive the higher wage.  *See Cooper v. Southern Co.*, 390 F.3d 695, 735 (11th Cir. 2004).  On summary judgment, Austal seizes on the "similarly situated comparators" requirement, and maintains that Woods cannot make such a showing.

As a general proposition, "[w]hen comparing similarly situated individuals to raise an inference of discriminatory motivation, the individuals must be similarly situated in all relevant respects besides race."  *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1273 (11th Cir. 2004).  In the context of a wage discrimination claim brought under Title VII (rather than the Equal Pay Act, which has no application here), however, a plaintiff satisfies his *prima facie* burden of comparability simply by showing that he "occupies a job similar to that of higher paid" persons outside the protected class.  *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (citation omitted); *see also Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1186 (11th Cir. 2005) (similar); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d

1518, 1533 n.18 (11th Cir. 1992) (in pay discrimination context, "[f]actors such as experience and education operate as a defense to liability rather as part of a plaintiff's *prima facie* case").[35]

Taking the record in the light most favorable to him, Woods has plainly satisfied the comparator requirement for a *prima facie* case of disparate pay. Plaintiff's evidence shows that (i) Martin (a white employee) had the same pipewelder job title as Woods from September 2007 through Woods' discharge in May 2008, and (ii) Austal paid Martin a higher hourly wage than Woods throughout that time period. Specifically, Martin received wages of $17.00 per hour in September 2007, $18.00 per hour from October 2007 through February 2008, and $20.00 per hour from February 2008 through May 2008; meanwhile, Woods was paid $15.00 per hour from September 2007 through April 2008, and $18.00 per hour from April 2008 through May 2008. This evidence is sufficient to establish the "comparator" element of a *prima facie* case of disparate pay under Title VII and § 1981.[36]

Plaintiff having made a *prima facie* showing of discriminatory pay, the burden shifts to Austal "to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Crawford*, 529 F.3d at 976. Defendant says that Martin was paid more than Woods because "Martin's performance far exceeded Woods, and he primarily had different supervisors than Woods." (Doc. 30, at 14 n.16.) Defendant further explains the pay differential by stating that Woods only requested $14.00 per hour, that he "did not have much welding experience," and that "his work performance was consistently poor, which would warrant paying his [*sic*] less than other employees." (*Id.* at 22.) As plaintiff correctly points out, however, the trouble with this showing is that Austal offers only its counsel's say-so, and no record evidence that these

---

[35] Notwithstanding the *Meeks* / *Miranda* line of authority, the Eleventh Circuit has allowed the more traditional "similarly situated" standard to seep into its analysis at times. *See, e.g., Crawford*, 529 F.3d at 975 (citing *Meeks* but opining that plaintiff had not presented "proper comparator" for disparate pay claim where comparator had been employed "for several years longer" and "possessed specialized and highly valued expertise" that plaintiff lacked); *Drake-Sims v. Burlington Coat Factory Warehouse of Alabama, Inc.*, 2009 WL 1393621, *7 (11th Cir. May 20, 2009) (applying "nearly identical" standard to comparators for *prima facie* case of disparate pay). *Meeks* is still good law in this Circuit; therefore, this Court will apply it in lieu of the more onerous "nearly identical" test championed by Austal.

[36] In its principal brief, Austal asserts in conclusory form that "Mike Martin is not a proper comparator" (doc. 30, at 22) for Woods' pay claim, without explaining why. For the reasons set forth above, the Court disagrees, at least for purposes of a *prima facie* case.

factors actually accounted for the pay differential between Martin and Woods. Defendant's Rule 30(b)(6) deponent testified only that compensation levels "were based upon an individual's skills, experience, background and actually to some level request" (Keeler Dep., at 120), without mentioning performance. Defendant identifies no evidence that Austal awarded performance-based pay raises during the relevant time period, even as a general proposition.[37] Moreover, defendant delineates no evidence showing why Martin received raises above $15.00, or why Woods' pay was frozen at $15.00 until April 2008.[38] The Court cannot accept on faith defense counsel's representation that those specific pay decisions were based on observed performance. *See Walker v. Mortham*, 158 F.3d 1177, 1181 n.8 (11th Cir. 1998) ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker … [and] a court may not assume, based on its own perusal of the record, that the decision-maker in a particular case was motivated by a legitimate reason," where the defendant does not offer specific evidence regarding decision-maker's actual motivations). And no defense witness has apparently said as much.[39] The law is clear that, to satisfy its intermediate burden of production in the *McDonnell*

---

[37]     Keeler's Declaration includes a statement that "[i]n setting an individual employee's pay rate and determining pay raises, Austal considers factors including, but not necessarily limited to, an employee's work performance and experience level." (Doc. 30, Exh. E, at ¶ 3.) Even assuming that this statement does not contradict Keeler's prior deposition testimony, there is no indication that this statement of Austal's current pay practices as of December 2010 (when the Keeler Declaration was executed) holds true for the August 2007 – May 2008 period at issue in this litigation, which timeframe predates Keeler's arrival at Austal.

[38]     To be clear, defendant does offer evidence that Austal generally viewed Martin as "a very, very strong learner, learned very quickly" and that Austal felt Martin "demonstrated performance and skills and developed at a very, very fast pace." (Keeler Dep., at 139, 201.) However, the specific documents lauding Martin's performance are dated May 2007 and June 2007. (*Id.* at Exhs. 13-14.) Those exhibits say nothing about Martin's performance at the time of his late 2007 and early 2008 pay increases. Also, there is no cited evidence linking Martin's pay increases of September 2007, October 2007 and February 2008 to those traits, as opposed to some other permissible or impermissible factor. The Court could not accept defendant's proffered explanation of the Martin/Woods pay differential without speculating as to the reasons for same, which of course is not sufficient to satisfy even defendant's modest burden of production.

[39]     In its reply brief, Austal insists that its Rule 30(b)(6) witness "specifically testified that Martin's pay was based on demonstrated performance and skills, along with the fact that Martin developed at a very fast pace." (Doc. 47, at 9-10.) The cited deposition excerpts (Continued)

*Douglas* analysis, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted). But Austal has not done so.[40]

Because plaintiff's *prima facie* case of pay discrimination as between his wages and those of white comparator Mike Martin has gone essentially unrebutted on summary judgment, genuine issues of material fact remain on this cause of action. Defendant's Motion for Summary Judgment is **denied** as to the Title VII and Section 1981 disparate pay claims predicated on comparator Martin.

## VI. Failure to Promote Claim.

### A. Relevant Facts.

Plaintiff also brings Title VII and § 1981 causes of action for failure to promote. As Woods put it, "I felt that my race kept me from advancing in the way that I wanted to" within the company. (Woods Dep., at 216.) In that regard, plaintiff admits that he never informed anyone at Austal that he desired a promotion. (*Id.* at 219.) He attempts to wave off his inaction and inertia by stating, "I never knew exactly what positions were open until they were already filled." (*Id.* at 216.)

Defendant's uncontroverted evidence is that by late 2007, Austal had a policy of posting all available supervisory positions on bulletin boards "to give everybody an opportunity that wanted to put in for the job. As long as they met the minimum qualifications and they didn't

---

contain no such specific assertions regarding the pay increases awarded to Martin, much less any corresponding testimony for why Woods did <u>not</u> receive similar increases.

[40]   *See, e.g., Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient" on summary judgment); *Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1275 n.11 (S.D. Ala. 2008) ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence."); Rule 56(c)(1)(A), Fed.R.Civ.P. (litigant on summary judgment asserting that particular facts are or are not disputed "must support the assertion by … citing to ***particular parts of materials in the record***") (emphasis added).

have discipline …, then they were interviewed." (O'Dell Dep., at 37.)[41]  On January 10, 2008, Austal posted the position of "Engineering Supervisor" internally (with the position to close on January 16, 2008), and posted the positions of "Pipe Foreman" and "Pipe Supervisor" on March 6, 2008 (with the positions to close on March 13, 2008). (Woods Dep., at Exh. 35.)  Plaintiff did not apply for any of these positions; indeed, his testimony is that he "can't even recall that [he] even remember[s] even seeing this."  (Woods Dep., at 218-19.)  But Woods does not deny that these postings were made on the dates specified therein, nor does he testify that he routinely scanned the bulletin boards for posted positions or otherwise took affirmative steps to seek out, monitor, or express interest in internal promotions.[42]  Woods does not identify successful applicants for any of these positions by name or by race.  Indeed, the Court cannot even discern from plaintiff's summary judgment submission which jobs he claims he was wrongfully passed over from receiving on the basis of his race.

**B.**     *Analysis.*[43]

---

[41]     An internal Austal document confirms that the policy of creating internal job notices, posting vacancies on notice boards, and interviewing internal candidates went into effect on or about October 5, 2007.  (Doc. 47, Exh. B.)  And Keeler stated that as of "[l]ate 2007 we had a posting process that was initiated and jobs were posted."  (Keeler Dep., at 87.)

[42]     On summary judgment, plaintiff places considerable weight on Woods' statement that when the postings "went up, the position was already filled." (Woods Dep., at 218.)  But there is no indication, and no reason to believe, that Woods has personal knowledge of (i) when the postings were actually placed on the bulletin board, or (ii) when the listed positions were filled.  There is no evidence or suggestion that Woods regularly consulted the bulletin boards for available promotions or that he ever inquired as to any positions listed, so that he might have had awareness of when the jobs were filled.  This kind of self-serving, conjectural testimony divorced from the witness's own personal knowledge is not properly considered on summary judgment.  *See generally Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form.").

[43]     Austal contends that the failure-to-promote claim brought under Title VII should be dismissed as beyond the scope of Woods' EEOC Charge.  Before a plaintiff may pursue a Title VII discrimination claim, he must exhaust his administrative remedies.  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001).  To exhaust his remedies, the plaintiff must file a timely charge of discrimination with the EEOC.  *Id.* (citing 42 U.S.C. § 2000e-5(b)).  A plaintiff is precluded from bringing Title VII claims in a civil action unless they are reasonably related to the underlying charges raised before the EEOC.  *See Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004) (explaining that "a plaintiff's judicial (Continued)

A plaintiff may establish a *prima facie* case of discrimination based on an employer's failure to promote him by showing that: (1) he is a member of a protected class; (2) he was qualified for and applied for the position; (3) he was denied the position; and (4) other equally or less qualified employees who were not members of the protected class were promoted. *See Brown v. Alabama Dep't of Transportation*, 597 F.3d 1160, 1174 (11th Cir. 2010); *Williams v. Waste Management, Inc.*, 2011 WL 207932, *2 (11th Cir. Jan. 25, 2011). If the plaintiff satisfies these elements and the employer asserts a legitimate, non-discriminatory reason for the promotion decision, the plaintiff must then prove that the employer's proffered reason is pretextual. For example, if the employer's proffered reason is that the successful applicant had superior qualifications to plaintiff, then the plaintiff must show that the disparities between his qualifications and those of the successful applicant are "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Brooks*, 446 F.3d at 1163 (quotation marks and citation omitted).

On summary judgment, Austal challenges Woods' ability to satisfy the second and fourth elements of the *prima facie* case. Plaintiff admits that he never applied for, or even expressed interest in, any available promotion at Austal. Defendant also asserts that plaintiff has never identified white employees who were unfairly promoted in his stead.

In response, Woods invokes the futility doctrine. (Doc. 36, at 36-38.) Even where a plaintiff fails to apply for a promotion, he "may nonetheless establish a *prima facie* case by showing that [h]e refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002). But is not enough for a plaintiff to state in conclusory

_____

complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"). Although judicial claims that "amplify, clarify, or more clearly focus" the allegations in the EEOC Charge are permitted, a Title VII complaint may not allege new acts of discrimination. *See id.* at 1279-80. Austal has argued, with no dissent from Woods, that the failure-to-promote claim exceeds the scope of Woods' EEOC Charge, such that the Title VII aspect of it is barred for failure to exhaust administrative remedies. The Court agrees. Nothing in the Charge alleges racially discriminatory denial of promotions. (Woods Dep., at Exhs. 37, 38.) Therefore, the Title VII claim of failure to promote is **dismissed** on that basis. The analysis on the merits will focus on the § 1981 iteration of this claim, as to which no exhaustion requirement attaches.

form that applying for a promotion would have been futile. Rather, "[t]o have a 'justifiable belief' …, a person must demonstrate: (1) that she had a real and present interest in the job for which the employer was seeking applications; and (2) that she would have applied for the job but effectively was deterred from doing so by the employer's discriminatory practices." *Id.*

Plaintiff's evidence falls short as to both of these criteria. In particular, Woods never identified record evidence documenting specific positions for which he had a "real and present interest" in applying. Nor did plaintiff make any showing that discriminatory practices by Austal "effectively … deterred" him from applying. At most, Woods shows that he did not find about the vacancies until after they were filled.[44] Importantly, plaintiff does not rebut defendant's evidence that, from late 2007 onward, Austal posted all job vacancies internally and afforded internal candidates an opportunity to apply. Plaintiff does not specify which promotions he wanted. And he does not identify, either by name or by race, the successful applicants for those jobs. Instead, plaintiff's evidence amounts to nothing more than generalities about Austal policies and practices that were phased out by October 2007 (barely a month after Woods' hiring).[45]

In short, there is a total failure of proof as to plaintiff's *prima facie* burden on his failure-to-promote claim. Woods says he was generally interested in being promoted, but admits he neither shared that interest with Austal nor applied for any position. *See Smith v. J. Smith Lanier*

---

[44]     The record is devoid of evidence that Austal failed to post any promotion in which Woods was interested. And aside from Woods' own patently inadmissible guess that the positions were filled before they were posted, plaintiff offers nothing to suggest that he could not have learned of and applied for vacant positions before they were filled, had he diligently checked the bulletin boards and timely followed up. There is no evidence, for example, that Woods inspected the bulletin boards or inquired of supervisors regarding potential vacancies with any frequency. By all appearances, if Woods did not learn of posted positions until after they were filled, he has only his own inattentiveness to blame.

[45]     The crux of Woods' failure-to-promote claim is evidence that, prior to October 2007, Austal utilized an informal "good ole boy network" of promoting workers with no posting process. (O'Dell Dep., at 36, 225.) There is no evidence, however, that such a practice was in effect at Austal at any time when Woods sought promotion, and all of Austal's evidence is to the contrary. Plaintiff's discrimination claims must stand or fall on defendant's practices at times relevant to him. He cannot opportunistically seize on evidence of discontinued past practices that had no bearing on him in an attempt to cast unfounded claims in a favorable evidentiary light.

& *Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003) ("A general interest in being [promoted] without submitting an application is not enough to establish a *prima facie* case of [race] discrimination when the defendant-employer has publicized an open position."). Woods does not identify the positions he wanted, much less the race of the successful candidates. *See Brown*, 597 F.3d at 1179 ("In a failure-to-promote case, the plaintiff must show that other employees of similar qualifications who were not members of the protected group were *indeed promoted* at the time the plaintiff's request for promotion was denied.") (citation omitted); *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) ("a *prima facie* case of discriminatory failure to promote requires a showing that other equally or less qualified employees who were not members of the protected class were promoted") (citation and internal quotation marks omitted). Instead, he hangs his hat exclusively on general statements concerning Austal's practices pre-dating October 2007 and criticisms of Austal's record-keeping practices. That is simply not enough.

Without showing what promotions he desired, that he applied for or otherwise expressed interest in them, or that those positions were filled by persons outside the protected class, Woods' failure-to-promote claims do not make it out of the starting gate. Accordingly, the Motion for Summary Judgment is **granted** as to plaintiff's claims alleging failure to promote.

## VII.  Denial of Training Claim.

### A.  *Relevant Facts.*

Plaintiff's next claim is for discriminatory denial of training, again pursuant to both Title VII and Section 1981.

According to Woods, he was hired by Austal on the understanding that he would receive training "until I got up to par to go back to the vessel." (Woods Dep., at 225.) Instead, Austal assigned Woods "into production" rather than a dedicated training facility. (*Id.*) Because he was not in a formal training program, Woods "had to practice … in between working" while on the job, albeit while still "on the clock" and being compensated by Austal. (*Id.* at 63.) Defendant's uncontroverted evidence is that Woods' experiences in this regard were typical, in that "much of the training that took place … for pipe welders occurred on the job." (Keeler Dep., at 119.) Moreover, Woods did receive training, in the form of "a skills development process where he started with simple work and then … was advanced into more complex work as a pipe welder."

(*Id.*)[46]  When on-the-job training is factored into the equation, Woods "received extensive weld training at Austal" (Doc. 30, Exh. F, at ¶ 3), albeit perhaps not in the particular form or sequence that he wanted.

At some point, Woods learned that Austal had a "welding school."  According to Woods, "I wanted to get into the welding school."  (Woods Dep., at 140.)  Woods' testimony is that he "asked to go into the training school and they wouldn't let me." (*Id.* at 178.)  Plaintiff maintains that his supervisor, whose identity he cannot recall, said he could not go to welding school because "he needed me welding."  (*Id.* at 179.)  Plaintiff acknowledges that Austal employees who were sent to the training school were "mainly apprentices," rather than "first class welders" like Woods.  (*Id.*)

Plaintiff alleges that white employees received training that he was denied; however, he does not identify those individuals, but instead says, "I can't remember them people's names." (Woods Dep., at 226.)  Also, while plaintiff's brief asserts that "training is necessary to obtain certification," which in turn leads to pay increases and advancement (doc. 36, at 20), the cited record evidence does not support this proposition.  Plaintiff has not shown that either the initial training or the welding school he claims to have been denied were in any way "necessary" for raises or promotions.  Indeed, it appears that Woods himself received the certification in question without the benefit of such training, which undermines the entire premise of his assertion that training was a prerequisite for certification.

### B.       Analysis.[47]

---

[46]       The unchallenged evidence is that "while [Woods] was in training he was also in production.  It is on-the-job training."  (Keeler Dep., at 287.)

[47]       Once again, Austal argues that plaintiff's Title VII failure-to-train claim is barred for failure to exhaust administrative remedies.  As with the failure-to-promote claim discussed *supra*, Woods' failure-to-train claim was neither presented in, nor reasonably related to, the complaints of discrimination articulated in his EEOC Charge.  A Title VII plaintiff may not allege in his judicial complaint new acts of discrimination.  *See Gregory*, 355 F.3d at 1279-80.  That is precisely what Woods has done with respect to his failure-to-train theory.  Moreover, plaintiff does not respond to, much less rebut, Austal's exhaustion argument.  For the foregoing reasons, and because Woods' failure-to-train claim is beyond the scope of his EEOC Charge, the Title VII iteration of that claim is **dismissed** for want of exhaustion.  The merits analysis will proceed as to the § 1981 strand.

To evaluate the sufficiency of proof of a *prima facie* case of discriminatory training, courts typically require the plaintiff to show each of the following elements: (i) that the plaintiff belongs to a protected class; (ii) that the employer provided training to its employees; (iii) that the plaintiff was eligible for the desired training; and (iv) that he was denied training opportunities provided to similarly situated employees outside the protected class.[48]

Woods has not satisfied the fourth element of the *prima facie* case. He claims to have been denied two forms of training, to-wit: (i) initial training before being placed into production, and (ii) admission into Austal's "welding school." But the uncontroverted evidence is that Austal typically trains its pipewelders on the job, in the production process, and that Woods in fact received extensive on-the-job training. Moreover, Woods' own testimony reveals that most employees selected for Austal's welding school were apprentices, not first-class welders such as Woods. This evidence shows that plaintiff was not denied training opportunities that were customarily made available to Austal pipewelders. Furthermore, Woods has not identified a single white pipewelder who was given access to greater training opportunities, either in the complained-of areas or elsewhere. What we are left with is plaintiff's unsupported, vague and self-serving opinion that he was denied training on the basis of race, without a sliver of evidence that similarly situated white employees received that training. That is not sufficient to establish a *prima facie* case of disparate treatment. *See McCann*, 526 F.3d at 1373 (*prima facie* case of disparate treatment requires plaintiff to show that "employer treated similarly situated [white] employees more favorably") (citation omitted); *Alansari v. Tropic Star Seafood Inc.*, 2010 WL 2853652, *1 (11th Cir. July 22, 2010) ("A plaintiff fails to establish a *prima facie* disparate treatment case if he fails to show that he was treated less favorably than a similarly-situated person outside his protected class."); *Holifield*, 115 F.3d at 1564 (plaintiff's "opinion [that he

---

⁴⁸      *See, e.g., Thompson v. Potomac Electric Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002); *Richardson v. Blue Cross/Blue Shield of Kansas, Inc.*, 196 F. Supp.2d 1174, 1181 (D. Kan. 2002); *Kincade v. Firestone Tire & Rubber Co.*, 694 F. Supp. 368, 407 (M.D. Tenn. 1987); *Nation v. Winn-Dixie Stores, Inc.*, 570 F. Supp. 1473, 1475 (N.D. Ga. 1983); *Seymour v. Reader's Digest Ass'n, Inc.*, 493 F. Supp. 257, 264 (S.D.N.Y. 1980) ("plaintiff has failed to specify any comparable white employee who received better training and thus has failed to support a *prima facie* case").

was discriminated against], without more, is not enough to establish a *prima facie* case of race discrimination").[49]

For the foregoing reasons, defendant's Motion for Summary Judgment is **granted** as to plaintiff's Title VII and § 1981 claims alleging discriminatory failure to train.

## VIII. Hostile Work Environment Claim.

### A. *Relevant Facts.*

Plaintiff claims that he was subjected to a racially hostile work environment. According to Woods, he confronted racial hostility "almost every day" that he worked at Austal. (Woods Dep., at 60.) To support this allegation, Woods points to the following: Leland Daughtry, who supervised him from August 13, 2007 through December 24, 2007, referred to him as "boy" and treated him "disrespectfully" by "hollering" at him in the presence of others. (*Id.* at 29-30, 41-44.)[50] Woods never heard Daughtry yell at white employees or call them "boy." (*Id.* at 46-47.) Instead, this conduct was "always referred to" Woods because Daughtry treated Woods "like the joke of the crew." (*Id.* at 47.) Daughtry would "pick[] on" Woods and single him out for harsh treatment in a manner that he did not direct "towards the other guys," such that Woods felt "uncomfortable" working with Daughtry. (*Id.* at 61, 66.)[51] Plaintiff's testimony is that Daughtry

---

[49] The thrust of plaintiff's failure-to-train claim is that Austal promised him training, but did not provide it. For example, plaintiff bemoans that he "was placed immediately into production upon being hired at Austal, despite being told he would be receiving the necessary training." (Doc. 36, at 38.) Plaintiff further laments that he "never received the training he was told he would get." (*Id.*) But he has never identified a single similarly situated white employee who did receive such training. Merely saying that one wanted more training and that the employer should have provided it raises no inference of race discrimination, yet that is effectively how plaintiff frames his failure-to-train claim.

[50] Woods could not pinpoint how often Daughtry called him "boy," except to say that it happened on more than five occasions. (Woods Dep., at 71.) He equivocated when asked whether it was "less than 10" or "less than 20." (*Id.* at 71-72.) On this record, counsel's characterization of the evidence as being that "Daughtry screamed at Woods calling him 'boy' ***all the time***" (doc. 36, at 23 (emphasis added)) takes unwarranted liberties with the record.

[51] Defendant's evidence that Daughtry took a harsh and aggressive tone with all employees cannot be credited on summary judgment because it conflicts with plaintiff's testimony that he was singled out for adverse treatment in a manner that others were not. The Court cannot and will not weigh credibility or attempt to sort between the parties' versions of the facts concerning Daughtry, but will instead credit plaintiff's version.

-32-

treated white individuals on the crew better than Woods.  (*Id.* at 66.)[52]  But plaintiff does not recall any instances, and the record otherwise contains no evidence, that Daughtry ever treated other African-American crew members unfairly or harshly.  (*Id.* at 75-77.)[53]

Aside from allegations that Daughtry singled him out for poor treatment, Woods identifies other evidence that he contends is indicative of a hostile work environment. Specifically, plaintiff observed racial graffiti in Austal bathrooms, consisting of such items as "pictures of monkeys that were directed at black people," jokes invoking offensive racial stereotypes about blacks (such as blacks not using aspirin because they do not like "picking cotton") and using the "N-word," and others that he could not recall.  (Woods Dep., at 131-34.) When Woods reported the graffiti to supervisor Randy Morris, he says, Morris said "[t]hat's just ignorant or something and just shook it off."  (*Id.* at 135.)  Plaintiff's testimony is that the graffiti "stayed in there," and was not removed by Austal after he reported it.  (*Id.*)[54]  Plaintiff also testified that "you had people walking around with the Confederate flag t-shirts on" (*id.* at 134), but he did not say who these "people" were (or even whether they worked for Austal), how many

---

[52]     To show that Daughtry created a hostile work environment, plaintiff relies on his testimony that a white employee named Jay Burton told Woods that Daughtry had told Burton not to associate with Woods because Woods was black.  (Woods Dep., at 64-65.)  Woods never heard Daughtry make such a statement.  (*Id.* at 66.)  And plaintiff neither offers a declaration of Burton nor indicates that Burton is expected to be a witness at trial, to testify to what Daughtry said.  Defendant's objection to the hearsay nature of Woods' testimony about what Burton told him he heard Daughtry say is unrebutted by plaintiff's brief.  The objection is also well-founded. Accordingly, Woods' testimony about what he heard Burton say that Burton had heard Daughtry say will not be considered on summary judgment.  *See, e.g., Rowell*, 433 F.3d at 800 ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."); *Longcrier v. HL-A Co.*, 595 F. Supp.2d 1218, 1223 (S.D. Ala. 2008) ("The general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial.") (citations omitted).

[53]     In fact, the only African-American employee about whom Woods has a specific memory of Daughtry's treatment is Bob Millender, as to whom plaintiff testified Daughtry showed "respect" and "never came to him that way."  (Woods Dep., at 75-76.)

[54]     Given the clarity of plaintiff's evidence on this point, the Court cannot and will not credit movant's conflicting evidence that Austal promptly covered all graffiti on a regular basis.  (Doc. 30, at 8.)  As the parties are well aware, the record on summary judgment must be construed in the light most favorable to the non-movant.  Courts cannot make credibility determinations at the Rule 56 stage, as defendant apparently desires.

such people there were, how often it happened, whether he ever reported this observation to Austal, or how Austal responded.

In addition to Daughtry's conduct, the observed racial graffiti, and the presence of unidentified persons wearing "Confederate flag t-shirts" with unidentified frequency in unidentified locations, plaintiff points to one other line of evidence to support his hostile work environment claim. In approximately March 2008, Woods went into the void of a vessel in the course of performing his duties for Austal, and observed a "noose hanging down from the light fixture." (Woods Dep., at 206.)[55] Despite defendant's attempt to dispute what he actually saw, plaintiff's testimony was unequivocal that, in his perception, "[i]t was a noose. It was a rope tied with knots and had a loop at the bottom of it." (*Id.*)[56] Woods immediately summoned Morris to view the noose. Morris "looked at it and laughed it off and said it wasn't a real noose, because it didn't have thirteen knots in it." (*Id.* at 211.) "[B]asically all he did, was just laugh." (*Id.* at 212.) For unknown reasons, Woods viewed Morris's comment about "thirteen knots" as a Ku Klux Klan reference. (*Id.* at 211.)[57] Woods reported the noose incident to Austal Human Resources Coordinator Stephanie Pate on the very same day. (*Id.* at 212-13.)

---

[55]     Woods explained that the "void" of a vessel under construction is an area with a hole in the floor that goes down approximately 12 feet. (*Id.*)

[56]     Defendant's evidence is that perhaps it was not a noose because "[w]ithin our business ropes are used to suspend material in the pipe department …. So to have a rope with a loop on the end is not an uncommon practice in our yard and it is used routinely." (Keeler Dep., at 207.) And supervisor Morris, who actually saw the ropes in question, opined that "they were not nooses," but were instead "a typical way to secure pipe while a person was welding." (Doc. 30, Exh. D, ¶ 4.) Woods stated that "nooses" like that were not used to secure or hang pipe at Austal. (Woods Dep., at 215-16 ("I never seen a piece of pipe with a noose around it.").) For summary judgment purposes, the record shows both that Woods subjectively perceived it to be a noose and that it such a perception could reasonably have been held. But the record also shows the potential for other reasonable interpretations of that symbol which would have nothing to do with racial harassment.

[57]     The validity of Woods' perception is highly suspect. For example, American folk singer Woody Guthrie once sang, "Did you ever see a hangman tie a hangknot? / Did you ever see a hangman tie a hangknot? / I've seen it many a time and he winds, he winds / After thirteen times he's got a hangknot." That tune, "Hangknot, Slipknot," was devoid of any references to the KKK or racial hatred, but instead had an anti-capital punishment message. Sources suggest that the origins of urban legend that hangmen's nooses have 13 coils arise from nothing more sinister than the common superstition that 13 is an unlucky number. The Court is aware of no (Continued)

Woods never saw any other nooses while he was employed at Austal. (Woods Dep., at 220.) During that time period, however, he did hear about a "noose in the break room" and "the noose on the crane" at Austal. (*Id.* at 221.)

**B.       Analysis.**[58]

Hostile work environment claims are analyzed under the same standards of proof and the same framework as other Title VII cases. *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). To establish a claim of hostile work environment, Woods must show "(1) that [Woods] belongs to a protected group; (2) that [Woods] has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee …; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability." *McCann*, 526 F.3d at 1378 (citation omitted); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010) (using same standard for § 1981 hostile environment claim). On summary judgment, Austal focuses on the fourth element, namely, the severity or pervasiveness of the alleged racial harassment identified by Woods.[59]

_____

factual basis for linking 13 knots to Ku Klux Klan activities, as opposed to hangman's nooses generally, and will not construe Morris's comment as reasonably evincing racial hostility.

[58]       Defendant reiterates its argument (previously articulated as to the failure-to-train and failure-to-promote causes of action) that Woods' Title VII hostile work environment claim is barred for failure to exhaust administrative remedies. In response, plaintiff correctly points out that his EEOC Charge included allegations pertaining to his work environment. Indeed, the Charge contains specific allegations that Daughtry degraded and singled Woods out in a way that he did not treat white employees. (Woods Dep., at Exhs. 37, 38.) Those assertions are part and parcel of Woods' theory of a racially hostile work environment. As such, the Court would reasonably expect the scope of the EEOC's investigation arising from that Charge to encompass hostile work environment claims. Defendant's failure-to-exhaust argument is not well-taken with respect to Woods' Title VII claim of hostile work environment. *See Gregory*, 355 F.3d at 1280.

[59]       Plaintiff asserts that "[Defendant's motion for summary judgment concedes that Plaintiff has established the first three elements and the last element." (Doc. 36, at 43.) It did no such thing. For example, defendant's Rule 56 briefs forcefully argue that any harassment of Woods by Daughtry was unrelated to race, which directly implicates the third element of a (Continued)

In evaluating this element, several core principles must be borne in mind. First, the alleged harassment is relevant only insofar as it shows that Austal "discriminated because of [Woods'] membership in a protected group." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*). The Court does not consider statements or conduct that are unrelated to Woods' race. Second, "workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context." *Id.* Third, "[d]etermining whether the harassment was sufficiently severe or pervasive involves both an objective and subjective component." *McCann*, 526 F.3d at 1378 (citation and internal quotation marks omitted); *see also Reeves*, 594 F.3d at 809 ("The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.") (citations omitted). And fourth, in evaluating whether a work environment is sufficiently severe or pervasive to be actionable, courts must look to "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann*, 526 F.3d at 1378 (citations omitted); *see also Reeves*, 594 F.3d at 808-09 (same); *Bryant*, 575 F.3d at 1297 (while "the objective element is not subject to mathematical precision, we can infer that an environment is hostile or abusive from the circumstantial facts viewed in their proper context").

The totality of Woods' proffered evidence of a hostile work environment consists of the following: (i) a supervisor, Daughtry, called him "boy," "hollered" at him, and treated him "disrespectfully," all in a manner that he did not direct toward "the other guys"; (ii) Woods observed racial graffiti, which included pictures of "monkeys directed at black people," the "picking cotton" joke, and use of the "N-word"; (iii) Woods observed what he believed to be a noose on one occasion, and heard during his employment of two other nooses on Austal property; and (iv) Woods saw unspecified persons wearing "Confederate flag t-shirts" with

_____

hostile work environment claim. (Doc. 30, at 25-26.) Nonetheless, defendant's Motion for Summary Judgment centers on the fourth element, so the analysis herein will proceed in kind.

unspecified frequency. The severity and pervasiveness of the alleged harassment will be evaluated solely by reference to that universe of evidence.[60]

Plaintiff's evidence concerning Daughtry does not show severe and pervasive racial harassment; indeed, it does not appear to manifest racial harassment at all. To be sure, Woods'

---

[60] Plaintiff's summary judgment filings attempt to expand the inquiry exponentially by citing a multitude of evidence and allegations from the *Adams* Litigation. (Doc. 36, at 8-13.) In particular, plaintiff's brief details racial harassment at Austal's facilities before, during and after Woods' employment by offering evidence (or even mere accusation such as the 158-page *Adams* complaint found at Exhibit V of Woods' submission) that Austal employees and supervisors used the "N-word," that white Austal employees displayed Confederate tattoos, that there was "a lot of racial tension," that offensive and threatening racial graffiti happened all the time at Austal, that there were stick figures with nooses around their necks and the word "nigger" on Austal premises, and that nearly two dozen other African-American employees were inundated with racially offensive statements, drawings, e-mails and pictures (doc. 36, at 12-13).

Of critical importance, plaintiff offers no evidence that Woods was ever aware of these expanded allegations or occurrences during his employment at Austal. This omission is fatal to plaintiff's ability to rely on these materials in support of his hostile environment claim. It is true, of course, that a hostile work environment claim may rest on words and conduct that the plaintiff did not observe and that were not directed at him. *See Reeves*, 594 F.3d at 811 ("words and conduct that are sufficiently [race]-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff"); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995) (Title VII "plaintiff may have a viable hostile work environment claim even if the racial remarks were not directed at her"). But the law in this Circuit is clear that a hostile work environment claim can be predicated only on conduct, statements and incidents of which the plaintiff was <u>actually aware</u> during his employment. *See, e.g., Edwards*, 49 F.3d at 1522 ("some of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment"); *Melton v. National Dairy LLC*, 705 F. Supp.2d 1303, 1341 (M.D. Ala. 2010) ("A plaintiff may also support a claim of hostile work environment by the use of harassing conduct he learned of through hearsay, ***so long as he was aware of the harassing incidents at the relevant time***") (citations omitted and emphasis added); *Carpenter v. Kelley Foods of Alabama, Inc.*, 2005 WL 3277094, *3 n.4 (M.D. Ala. Dec. 2, 2005) (plaintiffs could not rely on incidents occurring after their termination to support claim that they subjectively perceived work environment as racially hostile); *Gonzalez v. Florida Dep't of Highway Safety and Motor Vehicles Div. of Fla. Highway Patrol*, 237 F. Supp.2d 1338, 1350 (S.D. Fla. 2002) (granting defendant's summary judgment motion on hostile work environment claim where plaintiff "has not always made it clear how and when he learned of" the purportedly discriminatory statements). Plaintiff has failed to show this crucial nexus between numerous incidents and events described in his brief, on the one hand, and his claims of a hostile work environment, on the other. Accordingly, those facts, allegations and record items are properly excluded from consideration, and the universe of incidents that the Court will consider for "severe or pervasive" purposes is that enumerated *supra*.

evidence is that Daughtry treated him harshly, yelled at him, and "rode him" in a way that he did not do to other workers.  But friction or personal animosity between supervisor and subordinate does not equate to a racially hostile work environment.[61]  Plaintiff neither shows nor even suggests that Daughtry treated other black employees in a similarly unfavorable manner; rather, his evidence is that Woods was the only employee – black or white – whom Daughtry treated harshly.  Plaintiff's attempt to tie Daughtry's actions to Woods' race rests exclusively on his use of the term "boy."  The Supreme Court has explained that a supervisor referring to an African-American plaintiff as "boy" "will not always be evidence of racial animus" and that such factors as "context, inflection, tone of voice, local custom, and historical usage" are consulted to assess whether it is evidence of discriminatory animus in a particular case.  *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006).  Plaintiff's evidence is only that Daughtry called him "boy" on more than five occasions and that he never heard Daughtry call anyone else (black or white) by that term.  He does not show that Daughtry made overtly racially derogatory statements to him or anyone else, or that any other Austal supervisor or employee ever called Woods "boy."  Nothing about the described context of those remarks shows them to be racially motivated.  *See, e.g., Ash v. Tyson Foods, Inc.*, 2006 WL 2219749, *2 (11th Cir. Aug. 2, 2006) (supervisor's use of the word "boy" to black employee was not evidence of race discrimination where usages were conversational and non-racial in context, were ambiguous stray remarks, and showed no indication of general racial bias at plant or by supervisor).

Even if they were evidence of racial animus, Daughtry's "boy" comments were infrequent and non-threatening, and plaintiff has made no showing that they interfered with his work performance.  And Daughtry supervised plaintiff for only a short time.  As such, these statements are not sufficiently severe or pervasive to alter the terms and conditions of Woods' employment, as required to sustain a claim of hostile work environment.  *See Alexander v. Opelika City Schools*, 2009 WL 3739441, *2 (11th Cir. Nov. 10, 2009) (testimony that supervisor

---

[61]     *See, e.g., Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301-02 (11th Cir. 2007) (noting that Title VII "does not prohibit harassment alone, however severe and pervasive," but rather prohibits only "harassment that discriminates based on a protected category" such as race); *Roberts v. Potter*, 2010 WL 1803836, *1 (11th Cir. May 6, 2010) ("Title VII prohibits discrimination based on race and sex, but does not serve as a shield against harsh treatment that is based on personal animosity.") (citation and internal quotation marks omitted).

and two co-workers called plaintiff "boy" constantly not sufficient to show hostile work environment, where he could recall only eight specific instances); *Washington v. Kroger Co.*, 2007 WL 433519, *3 (11th Cir. Feb. 8, 2007) (plaintiff's being called "boy" by co-worker for period of two or three months, while "demeaning," was "not severe or extreme," where no other employee used racially derogatory speech towards him); *Barrow v. Georgia Pacific Corp.*, 2005 WL 1926420, *3 (11th Cir. Aug. 12, 2005) (evidence that supervisors and co-workers occasionally used terms like "nigger," "boy," and "black ass" towards plaintiff is not sufficiently severe or pervasive to alter conditions of employment).

Similarly, nothing in plaintiff's evidence of racial graffiti or Confederate t-shirts shows that these types of occurrences were sufficiently severe or pervasive to alter the terms or conditions of his employment at Austal. Woods' testimony illuminated only a few examples of racial graffiti and was silent as to the frequency with which he observed or heard about those kinds of racial symbols being displayed on Austal property. The handful of instances of racial graffiti that he observed in an Austal bathroom were vulgar and offensive, to be sure; however, plaintiff's evidence is they amounted to mere offensive utterances, not severe or threatening comments directed at him personally. And plaintiff offers no evidence that exposure to sporadic racial slurs and symbols scrawled on bathroom walls interfered with his work performance.

The same is true of the rope that Woods saw, which he perceived to be a noose, as well as the two nooses about which he heard. Unquestionably, nooses are racially charged symbols of hatred and oppression, particularly in the Deep South. But the Eleventh Circuit has never held that the temporary display of a noose by a rogue employee creates a *per se* hostile work environment. Unpublished decisions are to the contrary. *See Barrow*, 2005 WL 1926420, at *2-3 (no hostile work environment where plaintiff observed a noose in another employee's locker, saw the letters "KKK" emblazoned on company premises, and was called a "nigger" three times by a superintendent); *Washington*, 2007 WL 433519, at *3 (no hostile work environment where employee hung plastic figurine, meant to represent plaintiff, with a rope); *Quarles v. Con-Way Freight, Inc.*, 2008 WL 1994916, *8 (M.D. Fla. May 8, 2008) (plaintiff failed to show sufficiently severe or pervasive conduct where white employee tied a noose and showed it to black employee, other employees used term "nigger" freely, and employees depicted black supervisor as a gorilla, where noose incident was "objectively offensive and physically threatening" but lacked necessary severity or pervasiveness). Plaintiff does not show that Austal

failed to take prompt remedial action when these noose incidents were brought to its attention, or that those offensive items were allowed to remain displayed. And it was not clear that the rope in the void was even a noose at all, as opposed to a rope used in the ordinary course of Austal's business. This is simply not sufficiently severe or pervasive to demonstrate a racially hostile work environment.

Nor does the analysis change when all of these circumstances are considered collectively, as required by applicable precedent. Even when all of this conduct (Daughtry using the word "boy" towards Woods, Woods seeing sporadic occurrences of racial graffiti and Confederate flag shirts, Woods seeing a rope that he believed to be a noose and hearing of two other nooses being displayed at Austal) is considered in the aggregate, the Court is of the opinion that it does not satisfy Woods' burden of showing that the complained-of harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatorily abusive work environment.[62] Accordingly, Austal's Motion for Summary Judgment is due to be **granted** as to Woods' § 1981 and Title VII claims of a racially hostile work environment.

---

[62] Plaintiff does not assert, much less show, that the particular incidents of which Woods was aware during his employment are sufficient to establish a racially hostile work environment. In arguing that the totality of the environment demonstrates the requisite severity or pervasiveness, plaintiff leans heavily on evidence from the *Adams* Litigation that this Court has rejected for lack of any showing that Woods was aware of it at the time. (Doc. 36, at 43-46.) Plaintiff argues that "display of the Confederate flag was pervasive throughout the entire shipyard" (doc. 36, at 44), but Woods never testified to observing personally or being aware of that. The same is true of plaintiff's claim that racially offensive e-mails were rampant at Austal. (*Id.*) And plaintiff's reliance on "[h]omemade racial stick figures with a noose around the head and the word 'nigger' written on it" (*id.*) is for naught absent anything linking that evidence to Woods' knowledge. In short, plaintiff tries to construct a claim of hostile work environment not on what Woods saw or knew about, but by abstracting away from Woods to events and occurrences at Austal of which he was apparently ignorant during his employment. Nor is this deficiency corrected by plaintiff's sleight of hand that knowledge of these activities was "in the air" at Austal. Counsel merely saying that "Woods was aware of the other … incidents of discrimination, not just the ones he found or saw" (*id.* at 44) and making vague allusions to news traveling quickly at the Austal plant is not sufficient to bootstrap in this other evidence. Counsel apparently believes that "[r]acial slurs or insults … quickly became known to everyone regardless of their work area." (*Id.* at 45.) There is no evidence of this, with respect to Woods and these specific incidents. The point is that the cornerstone of plaintiff's hostile work environment argument is evidence that simply has no bearing on Woods.

## IX. Retaliation Claims.

The parties' briefs reflect a mutual understanding that Woods is also bringing Title VII and § 1981 claims of retaliation pertaining to the following personnel actions: (i) discipline, (ii) suspension of certification and repeated recertification testing, (iii) job assignments, and (iv) termination. The Court will examine the record facts concerning Woods' protected activity and each of these alleged retaliatory acts, then consider each of them under applicable legal standards.

### A.    *Relevant Facts.*

#### 1.    *Plaintiff's Protected Activity.*

The record is clear that Woods complained to Austal about race discrimination on numerous occasions during his employment.

After receiving an evaluation in October 2007, plaintiff informed an Austal official named Paul Quinn (whose title is not listed by the parties but who apparently had supervisory authority over Daughtry) that Daughtry was treating him unfairly because of his race. (Woods Dep., at 40-43.)[63] Woods also complained to Bob Millender (who was apparently another African-American pipewelder, not a supervisor) within his first three months at Austal that Daughtry was treating him unfairly because of his race. (*Id.* at 72-75.) According to Woods, his specific statement to Millender was that "I'm tired of [Daughtry] treating me different because I'm black." (*Id.* at 74.) In January 2008, Woods voiced his concerns to Human Resources staff for the first time. Specifically, Woods complained to Stephanie Pate, Austal's HR Coordinator, that Daughtry was discriminating against him on the basis of race by calling him "boy" and directing jokes at him. Woods also told Pate that Daughtry "constantly rode" him. (*Id.* at 79-80, 82-84.) By the time Woods voiced these complaints to Pate, however, he no longer reported to Daughtry. (*Id.* at 86-87.) Woods testified that his sole purpose for reporting the matter to Pate was "starting a paper trail." (*Id.* at 89.)

---

[63]    Plaintiff's complaint to Quinn had the desired effect. Sometime later, Quinn informed him that "he was going to get [Woods] away from [Daughtry]." (*Id.* at 78.) Woods was reassigned away from Daughtry shortly thereafter. (*Id.* at 79.) The record also shows that Woods came to see Quinn in January 2008 "asking about pay." (Doc. 37, Exh. Q.) There is no indication, however, that Woods ever mentioned any racial component to his pay concerns.

Woods' complaints escalated in late February 2008, when he informed Pate that he believed Austal had suspended his welding certifications because he is black. (Woods Dep., at 95.) On February 28, 2008, he met face-to-face with Pate, Joe Johnson (Pipe and Machinery Manager) and Craig Perciavalle (Director of Operations) to discuss his concerns. (Keeler Dep., at Exh. 40.) Woods complained at that time that (i) his pipewelding certification cards had been wrongfully taken away; (ii) he "had a problem" with how Daughtry (who was no longer his supervisor) addressed employees; and (iii) he believed "the pipe department [was] holding him back from doing what he want[ed] to do." (*Id.*) Woods stated numerous times in that meeting that he believed Austal was mistreating him because he is black. (Woods Dep., at 128-29.) In response, Johnson explained that Woods had made potentially costly mistakes in his work on the littoral combat ship project, that Austal must produce a quality product, that his welds must be of a consistently high quality, and that Woods would have an opportunity to recertify within 90 days. (Keeler Dep., Exh. 40.) Woods unsuccessfully sought an audience with Austal's Chief Executive Officer in late February to complain that his certifications had been pulled because of his race. (Woods Dep., at 96-97 & Exh. 12.)

### 2. Woods' Job Assignments.

Plaintiff testified that after his certifications were suspended in February 2008, Austal began assigning him "crap work to try to make [him] quit." (Woods Dep., at 198.) This "crap work" included tasks such as straightening out the pipe rack by himself, cutting hangars and measurements, and otherwise performing tasks typically assigned to fitters, rather than pipe welders. (*Id.* at 199.) He described one of these assignments as a "filthy, nasty job," which he nonetheless completed. (*Id.* at 200.) Woods contends that Austal modified his job assignments in the February/March 2008 time frame in retaliation for his complaints about race discrimination.

### 3. Woods' Certifications and Discipline.

In mid-February 2008, a chain of performance issues involving Woods commenced that ultimately culminated in the termination of his employment in late May 2008.

Plaintiff's first warning was issued on February 15, 2008 by a supervisor named Fred Drago for lack of production. (Woods Dep., at 194-95 & Exh. 28.) The gist of the warning was that Woods had completed only five and a half welds at the "fab table" in an eight-hour period, which Drago viewed as an unacceptably low rate of production.

In performing his pipewelder duties, Woods was required to maintain certain welding certifications. On or about February 15, 2008, supervisor Randy Morris suspended the certifications of both Woods and a white employee named Ryan Schlieper after discovering errors as to a pipe they had both welded. The written warning that Morris issued to Woods on February 18 set forth the following justification: "Not adhering to work standards and requirements. Did not stencil welds as required." (Woods Dep., Exh. 29.)[64] Morris explained that both Woods and Schlieper had "failed to stencil their welds," and that both of them had admitted to welding on that pipe and not stenciling their welds, as required by Austal procedure. (Doc. 30, Exh. D, ¶ 6.)[65] Woods acknowledges that both he and Schlieper had worked on the pipe, and that both of their certifications were suspended as a result. (Woods Dep., at 105.)[66] However, Woods contested this disciplinary action on the ground that the weld had already been "messed up" by Schlieper before Woods ever started working on it, and that the spot Woods welded did not have a defect. (*Id.* at 104-05.)

Next, on March 5, 2008, Morris issued a warning to Woods for excessive absenteeism. The warning stated as follows: "4 occurrences have been accrued from absences. This notice serves as a documented verbal warning." (Woods Dep., at Exh. 30.) Woods was not at work on the day this warning was issued. (*Id.* at 197.)

---

[64]    Morris issued an identically worded warning to Schlieper for this incident. (Doc. 30, Exh. E, at ¶ 5 & Exh. 3.)

[65]    Austal required welders to stencil their number on a weld, essentially to identify the person who had performed the work. Woods maintains that stenciling was inappropriate in this case because it is only required "if you make a complete weld." (Woods Dep., at 110.) Woods had not made a complete weld on the subject pipe, so he did not believe he was required to stencil it. (*Id.*) Aside from the stenciling issue, the underlying quality problem with the weld was that the pipe had "sugared," meaning that there was clumping on the inside of the pipe because of a welder or welders' failure to purge the line (*i.e.*, by pushing gas through the pipe to remove oxygen) before completing the weld. (Woods Dep., at 106-07.) The result was an improper, or simply bad, weld. (*Id.* at 107-08.) An Austal quality inspector who reviewed pictures of the weld deemed it to represent "a very poor practice of welding," as to which removal of the welders' performance qualifications was warranted. (Doc. 30, Exh. F, at Exh. 1.)

[66]    According to Woods, his certification was suspended immediately, but Schlieper's was suspended only later, after Woods complained to Pate. (Woods Dep., at 108.) Woods testified that he saw Schlieper continuing to weld after this incident, so he knew Schlieper's certification had not been pulled. (*Id.*)

On March 28, 2008, Morris issued a warning to Woods for poor performance, indicating that his continued employment at Austal was in jeopardy. (Woods Dep., at Exh. 31.) This notice documented that Woods had "been warned of his unsatisfactory work accomplishments and his lack of a sense of urgency," and stated that Woods had taken an unreasonably long period of time to perform a "simple assignment" which he had not completed in a timely manner despite "clear instructions." (*Id.*) The March 28 warning further indicated that Woods "shows very poor work ethics," that another employee had completed the job quickly, and that "(30 days) next <u>warning</u> may warrant <u>termination</u>." (*Id.*) Notwithstanding these documented concerns, Morris approved a pay raise for Woods on April 7, 2008, increasing his hourly wage from $15.00 to $18.00. (Doc. 30, Exh. D, ¶ 7 & Exh. 1.)

### 4. Retesting / Recertification.

Plaintiff also alleges retaliation with respect to the recertification process to which Austal subjected him following the February 15, 2008 suspension of his certification.[67]

On March 19, 2008, Woods took two welding tests in an attempt to regain certification. Those tests, called "restricted" tests because they refer to welds performed in confined space, included tests for stainless steel and copper nickel. Bob Millender (an experienced Austal welder) visually inspected and approved Woods' weld samples (called "coupons") and signed the requisite monitoring forms for those tests. (Woods Dep., at Exhs. 23, 24.) To pass these tests, however, Woods' coupons had to pass not only Millender's visual inspection but also an x-ray examination performed by an outside company. (Woods Dep., at 149-50.) Woods' stainless steel coupon passed the x-ray examination, but his copper nickel coupon did not. (*Id.* at 168-69 & Exh. 25.)

To complicate matters, two Austal employees raised concerns "about whether or not Edwin Woods performed the test properly and brought into question the validity of the test." (Keeler Dep., at 177.) The problem was that Woods might have "rolled the coupon" by

---

[67] Both parties' briefs discuss at length Woods' initial testing for certification at Austal from September 2007 through January 2008. However, neither side shows how this evidence relates to any cause of action or summary judgment issue. There is no allegation, and no reason to believe, that Woods is predicating his race discrimination or retaliation claims against Austal on the testing process and results in fall 2007 and January 2008. Accordingly, that line of evidence is only tangentially relevant for the pending Motion for Summary Judgment.

essentially moving the pipe (which was supposed to remain stationary because of the "restricted" nature of the test) during the testing process. (*Id.* at 183-86; Woods Dep., at 151-52.) Simply put, "if you could roll the weld you would have a likely better penetration and a better weld. That's why the restricted need." (Keeler Dep., at 186.) The x-ray would not reveal whether the weld had been rolled or not. (*Id.*; Woods Dep., at 152.) And Millender's initial visual inspection was made without knowledge of the possibility that the coupon had been rolled. Morris reviewed a security tape of the testing process; however, that exercise was inconclusive as to whether Woods had performed the test properly. (Keeler Dep., at 110-12.) In light of these circumstances, Austal had a quality analyst named Nick Cooper review Woods' coupon. Cooper found that the coupon "presented signs and indications that it was not welded in the proper position in accordance with the test requirements." (Doc. 30, Exh. F, ¶ 5.)

Rather than taking disciplinary action against Woods based on its suspicion that he had rolled the weld, Austal (and more specifically, Johnson and Cooper) asked him to retake the test. (*Id.*) Woods did retake the test on April 3, 2008, and again passed the stainless steel restricted test, but failed the copper nickel test based on x-ray examination. (Doc. 30, Exh. E, ¶ 4 & Exh. 2.) Austal acknowledged at the time, however, that Woods' copper nickel test may have been compromised by problems with the machine he had used, rather than any shortcoming with Woods' performance. (Keeler Dep., at 173-74 & Exh. 29.) There is no indication in the record of Austal taking any adverse action against Woods based on the results of his restricted test results in April 2008. By all appearances, he was not penalized for a test result that Austal acknowledged might not have been his fault. Indeed, he was given a pay raise within days after those test results became known, for the stated reason that he had passed his restricted tests. (Doc. 30, Exh. E, at ¶ 4; doc. 30, Exh. D, at Exh. 1.)

### 5. Termination.

On May 7, 2008, Woods was transferred away from the high-speed ferry project on which he had been working for four months, and was returned to duty on the littoral combat ship project under a different supervisor, Ralph Compton. (Woods Dep., at Exh. 11.) Austal's stated reason for this transfer was "increased manning needed on LCS." (*Id.*)

On May 27, 2008, less than three weeks after the transfer took effect, Austal terminated Woods' employment. Austal's written record of this decision is signed by both Compton and Joe Johnson, and states as the reason for Woods' termination the following: "Failing to follow

weld requirement – bad workmanship." (Doc. 30, Exh. E, ¶ 6 & Exh. 4.) Woods' unrebutted testimony shows that Johnson (not Compton) was the actual decisionmaker. (Woods Dep., at 181.)[68] At a pre-shift meeting on May 27, Johnson notified Woods that he was being terminated for "not purging the line" the previous day. (*Id.* at 184.) When Woods objected that he had purged his line, Johnson responded, "if you purged you [*sic*] line, then I guess we're going to terminate you for not looking at your weld." (*Id.*) Woods' position is that the line had previously been purged by another Austal employee, and that Woods did look at the weld until it was "zipped," at which time it was "impossible … to look inside to see what's going on." (*Id.* at 184-85.) Nonetheless, at the termination meeting, Johnson kept insisting to Woods, "You didn't look at the weld." (*Id.*)

With respect to the underlying incident, Woods' testimony was that the line had already been purged and "there was nothing wrong" when he worked on the pipe in question. (Woods Dep., at 186.) Plaintiff contends that he learned after his discharge that "there was a problem with the line" that accounted for the poor weld. (*Id.* at 189-90.) Austal's view is different. Defendant's evidence is that Woods did not follow proper procedure on that weld because he "did not finish his weld and close it as he was supposed to do," but "[i]nstead, he left his weld open," creating a risk of sugaring. (Doc. 30, Exh. M, at ¶ 2.)[69]

**B.     *Legal Standard.***

To establish a *prima facie* case of retaliation under Title VII or § 1981, Woods must show that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the

---

[68]     The meeting where Woods was terminated was attended by Johnson and Pate, with Compton telling Woods in the hallway beforehand that he had been "trying to save" his job. (*Id.* at 181-82.)

[69]     According to Woods, the same thing happened to a white employee named Mike Martin one day after Woods' discharge, but instead of terminating him, Austal officials said to Martin, "just weld it up, don't worry about it." (Woods Dep., at 191.) The only non-hearsay evidence about the Martin incident is that Martin did follow procedure because he "went and got someone else to finish his weld for him so that his weld was not left open," whereas Woods did not. (Doc. 30, Exh. M, at ¶ 2.) Austal supervisor Dwain Murphy opined that "Woods should have closed his weld or gotten someone else to help him do it like Mike Martin did." (*Id.*, ¶ 4.) Thus, defendant's uncontroverted evidence is that Woods and Martin were not similarly situated as to this particular welding problem because each of them handled it differently.

adverse action." *Bryant*, 575 F.3d at 1307-08; *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted).[70] If the employer articulates legitimate reasons for the challenged actions, then the plaintiff must "show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *McCann*, 526 F.3d at 1375 (citation omitted).

As a threshold matter, it bears emphasis that the "adverse action" test applied to retaliation claims is distinct from that applied to disparate treatment claims. Defendant's arguments on the retaliation claims overlook this distinction by advocating use of the strict disparate treatment standard. Such an approach is irreconcilable with Circuit law. *See Crawford*, 529 F.3d at 973-74 & n.14 (explaining that under new test for adverse action in retaliation context, "the type of employer conduct considered actionable has been broadened," the new standard for adverse action in retaliation cases is "decidedly more relaxed" and "accords an employee protection from a wider range of retaliatory conduct," and "while the new standard … applies to Title VII retaliation claims, it has no application to substantive Title VII discrimination claims"); *Pears v. Mobile County*, 645 F. Supp.2d 1062, 1094 (S.D. Ala. 2009) (recognizing a "more stringent standard for adverse employment actions in discrimination claims" and a "more liberal standard applicable in the retaliation setting"). It is therefore instructive to contrast the proper test for the "adverse action" element of a disparate treatment *prima facie* case (which does not apply here) with that for a retaliation *prima facie* case (which does).

In the Title VII discrimination context, "[n]ot all employer actions that negatively impact an employee qualify as adverse employment actions." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (citation and internal quotation marks omitted). Rather, "only those employment actions that result in a *serious and material* change in the terms, conditions, or

---

[70] "To show causation, a plaintiff in a retaliation case need prove only that retaliatory animus was one factor in the adverse employment decision." *Brown*, 597 F.3d at 1182.

privileges of employment will suffice. … [T]he employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* (citations and internal quotation marks omitted).  By contrast, the test for an adverse employment action in retaliation cases is whether the employer's conduct "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one." *Crawford*, 529 F.3d at 974.  Thus, in the retaliation context, a "materially adverse action" is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citation omitted). In this regard, the Eleventh Circuit has read applicable Supreme Court precedent in retaliation cases as "strongly suggest[ing] that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Id.* at 973 n.13.[71]

In determining whether the requisite level of adversity is reached, it is necessary to examine the alleged adverse actions in the aggregate.  *See, e.g., Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005) ("In deciding whether employment actions are adverse, we consider the employer's acts both individually and collectively."); *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1118 (11th Cir. 2001) ("While the other actions might not have individually risen to the level of adverse employment action under Title VII, when those actions are considered collectively, the total weight of them does constitute an adverse employment action.").

That said, certain of Woods' Title VII claims of retaliation are plainly time-barred.  It is black-letter law that a plaintiff may not sue under Title VII before exhausting administrative

---

[71]     Under the current test, retaliatory conduct need not be workplace- or employment-related to satisfy this element.  *See Crawford*, 529 F.3d at 973 ("the type of employer conduct considered actionable has been broadened … to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related").  Thus, strictly speaking, the "adverse employment action" requirement for retaliation cases is more accurately characterized as a "materially adverse action" requirement, yet the Eleventh Circuit has continued to use the former (and now ill-fitting) terminology.  *See, e.g., Dixon*, 627 F.3d at 856 ("To establish a *prima facie* case of Title VII retaliation, the Dixons must show that … they suffered a materially adverse employment action"); *Jackson v. Winn-Dixie*, 2008 WL 5435576, *10 n.17 (S.D. Ala. Dec. 31, 2008) ("The Eleventh Circuit's continued usage of the term, 'adverse employment action,' in describing a *prima facie* case of retaliation appears anachronistic.").  The Court will adhere to this Eleventh Circuit nomenclature for purposes of this Order.

remedies by filing a timely charge of discrimination with the appropriate agency (in this case, the EEOC). *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). "In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act." *Carter v. University of South Alabama Children's & Women's Hosp.*, 510 F. Supp.2d 596, 606 (S.D. Ala. 2007). "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful." *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002); *see also Sheffield v. United Parcel Service, Inc.*, 2010 WL 4721613, *2 (11th Cir. Nov. 22, 2010) ("If a party fails to comply with the charge-filing requirement, he cannot assert a claim in court."); *Jordan v. City of Montgomery*, 2008 WL 2529573, *1 (11th Cir. June 26, 2008) ("Failure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge."). Insofar as Woods is complaining about alleged acts of retaliation occurring more than 180 days prior to the filing of his EEOC Charge (*i.e.*, prior to May 2, 2008, which is 180 days before October 29, 2008, when he signed his Charge), those claims are barred under Title VII.[72] Accordingly, plaintiff's Title VII claims of retaliation are **dismissed** for all events predating May 2, 2008, which would encompass everything except for his discharge. This deficiency does not affect plaintiff's § 1981 retaliation claims, inasmuch as that statute has no corresponding exhaustion requirement.

### C. Application of Legal Standard to Particular Retaliation Claims.

#### 1. Job Assignments.

As noted, among Woods' retaliation complaints is that Austal retaliated against him by assigning him what he inelegantly called "crap work" after he complained of race discrimination. Austal's only articulated rejoinder to that claim is that "Woods cannot show that being given less desirable work qualifies as an adverse action for purposes of retaliation." (Doc. 47, at 13.) The Court disagrees. It is true that a *prima facie* case of retaliation under § 1981 requires a plaintiff to show that he suffered a materially adverse action. But in the retaliation context, a "materially adverse action" is simply one that "well might have dissuaded a reasonable worker from making

---

[72] Defendant properly raised the timeliness / exhaustion issue concerning the Title VII retaliation claims in both its principal and reply briefs. (Doc. 30, at 19-20, 29; doc. 47, at 12.) Plaintiff did not respond to or rebut this argument, nor could he do so in light of the authorities and principles outlined *supra*.

or supporting a charge of discrimination." *Crawford*, 529 F.3d at 974. Plainly, a reasonable fact finder could determine that the prospect of being assigned "crap work" that was demeaning, filthy and physically unpleasant well might have dissuaded a reasonable worker from engaging in statutorily protected activity. For that reason, Austal's contention that Woods has not shown an adverse employment action does not hold water as to the job assignment issue. Defendant's Motion for Summary Judgment is **denied** as to that component of the § 1981 retaliation claim.[73]

### 2. *Certification / Discipline.*

With respect to Woods' retaliation claims predicated on discipline (including write-ups, suspension of certifications, and other events predating Woods' termination), Austal again argues that none of those events qualify as materially adverse actions for purposes of a *prima facie* case of retaliation. (Doc. 30, at 29; doc. 47, at 17.) But it cannot seriously be debated that a reasonable employee might be dissuaded from complaining of unlawful discrimination by having his welding certifications suspended and being subjected to repeated verbal and written discipline. So defendant's argument that Woods cannot satisfy the *prima facie* element of an adverse employment action as to this retaliation claim is misguided.

Next, Austal argues that plaintiff cannot meet the causation requirement because he has not shown that the decisionmaker for the complained-of discipline was aware of Woods' protected activity. Without proof that the Austal supervisors who disciplined Woods were aware of his internal complaints of discrimination, Woods cannot establish the requisite causal connection. *See, e.g., Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (to prevail on retaliation claim, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citations omitted). Most of the contested disciplinary write-ups were issued by Randy Morris. Moreover, plaintiff relies on evidence that Morris "was involved in pulling the certs" and was "the individual that

---

[73]     Aside from its *prima facie* case argument applying the wrong legal standard, Austal generally argues that "Austal had legitimate, non-discriminatory reasons for every action taken with respect to Woods." (Doc. 30, at 30.) The problem is that Austal has not advanced any legitimate non-retaliatory explanation for the job assignments in question. Simply put, the Court cannot discern why Austal says it altered Woods' assignments after he lodged internal complaints of race discrimination. In *McDonnell Douglas* terms, defendant has failed to meet even its modest burden of production with regard to this portion of the retaliation claim; therefore, summary judgment is inappropriate.

was leading through this testing process." (Keeler Dep., at 189; doc. 36, at 27 n.25.)  Thus, Morris appears to be the key Austal decisionmaker for purposes of most of the disciplinary write-ups and recertification testing.  So Morris's awareness or lack of awareness of plaintiff's discrimination complaints – and the timing of such awareness – are of critical importance.

Defendant offers Morris's testimony that (a) he never heard that Woods had complained that Morris was discriminating or retaliating against him until after Woods' termination, and (b) Woods never told Morris that Daughtry was discriminating against him on the basis of race. (Doc. 30, Exh. D, ¶¶ 3-4.)  Plaintiff's evidence is that, while he did complain to Morris, he "never complained to [Morris] about racial discrimination or harassment from anyone."  (Keeler Dep., at Exh. 43.)  Rather, the record shows nothing more than that Woods complained to Morris "about the way [Daughtry] talked to employees."  (*Id.*)  That is not protected activity.  At best, Woods shows that he complained to Morris about graffiti in the bathrooms and the noose in the void. (Woods Dep., at 131.)  But he offers no time frame for the graffiti complaint, other than to say it occurred while he was working on the high-speed ferry (which was between early January 2008 and early May 2008).  (*Id.* at 135.)  Also, plaintiff's only evidence about the time frame of the noose incident is that it occurred "a little while after" the February 26, 2008 meeting.  (*Id.*) Even taking this evidence in the light most favorable to plaintiff, he has not shown that he ever complained to Morris about race discrimination prior to the February 18 write-up or the mid-February suspension of his welder certification.[74]  Because there is no evidence that Morris was aware of any protected activity at the time he took these challenged actions, plaintiff has failed to satisfy the causal connection element of his *prima facie* case with respect to the February 18 write-up and suspension of his welder certification.  Austal is entitled to summary judgment on these aspects of plaintiff's retaliation claim.[75]

---

[74]        Plaintiff's brief is silent as to the temporal dimension of when Morris learned of Woods' protected activity.  Indeed, plaintiff addresses the causal connection issue with a perfunctory footnote saying that the lack-of-knowledge "contention has been easily dismissed," without offering any details as to why or how.  (Doc. 36, at 49 n.39.)  It is not this Court's responsibility to develop a litigant's arguments for it.

[75]        Even if Woods had established a *prima facie* case as to these portions of his retaliation cause of action, the result would be unchanged.  Austal has articulated legitimate nonretaliatory reasons for each of these decisions, to-wit: Woods' failure to follow proper welding procedures, including stenciling the welds, was Morris's stated reason for both issuing (Continued)

Plaintiff's remaining retaliation claims concerning discipline and certification issues relate to the February 15 lack-of-production warning, the March 5 attendance warning, the March 28 poor performance warning, and Austal's handling of the retesting procedure in late March 2008. The February 15 lack-of-production warning was issued by supervisor Fred Drago. (Woods Dep., at Exh. 28.) Plaintiff has come forward with no evidence that Drago had any inkling of Woods' complaints of race discrimination at the time he issued that warning;[76] therefore, any retaliation claim predicated on the February 15 written warning likewise fails for want of the causal connection required as part of Woods' *prima facie* case. As for the March 5 and March 28 warnings, plus the retesting procedure in late March, plaintiff has adequately established the causal connection element of the *prima facie* test. Again, the parties appear to concur that Morris was the decisionmaker (or at least the primary decisionmaker or motivating force) for those events. Plaintiff's evidence is that Woods complained to Morris about the noose in the void shortly after February 26, 2008. Woods' complaint about the noose was plainly protected activity, and these three incidents all followed on the heels of plaintiff's protected conduct to Morris by a matter of days or weeks; therefore, the causal connection element is satisfied.

---

the February 18 warning and pulling his certification. Defendant having made such a showing, "the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Crawford*, 529 F.3d at 976. Woods has not met this burden of showing pretext. Notably, plaintiff's brief articulates no specific pretext arguments directed at these decisions, but instead argues about the existence of a racially hostile work environment, which says nothing about whether these challenged personnel actions were a pretext for unlawful retaliation. (Doc. 36, at 48-50.) Plaintiff confuses his argument that Austal was motivated by racial hostility (which is irrelevant to his retaliation claim) with a showing of pretext that Austal was motivated by unlawful retaliation. At best, Woods shows that he disagrees with the wisdom of Austal's decision to discipline him and remove his certifications. That is simply insufficient to establish pretext. *See Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient."). Any suggestion of pretext by Woods rings particularly hollow as to these incidents given the undisputed evidence that Morris issued the same discipline (including suspension of certifications) to another employee (Schlieper) for the same incident. Thus, Austal treated both the complaining employee (Woods) and a non-complaining employee (Schlieper) the same way for the same conduct.

[76]     In fact, Woods admitted that he "never had a problem" with Drago. (Woods Dep., at 53.)

Plaintiff having made a *prima facie* showing of retaliation as to the March 5 and March 28 warnings and the March retesting process, the burden of production shifts to defendant to articulate a legitimate nonretaliatory reason. For the March 5 warning, defendant shows that plaintiff had in fact missed work five times in the previous 30 days. (Doc. 37, Exh. L.) For the March 28 warning, defendant's position is that Woods was written up for unsatisfactory work performance because his performance was indeed unsatisfactory, in that he spent several hours working on (without completing) a simple assignment that a colleague finished in just 45 minutes. And for the March retesting process, defendant points to evidence that uncertainties about the integrity of Woods' March 19 restricted tests provided a legitimate nonretaliatory reason for Austal to ask him to retest.

Defendant having met its intermediate burden, the summary judgment analysis for these claims hinges on plaintiff's showing of pretext. To show that an employer's stated reason is pretext for unlawful retaliation, the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted).[77] "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient." *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason … was pretextual.").

Woods attempts to show pretext for the March 5 attendance warning by asserting that Austal has provided "no documentation regarding any of these alleged absences," and that Austal has no policies governing discipline for excessive absences. (Doc. 36, at 27 ¶ 26.) Both

---

[77]     *See also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

statements are factually incorrect. Plaintiff's "lack-of-documentation" contention is perplexing, inasmuch as he cites to an Austal document showing the exact dates and excuses given for Woods' absences. (Doc. 37, Exh. L.) Certainly, Woods has never disputed that he was actually absent on those dates, and Austal's evidence adequately establishes that he was. Moreover, Austal's Employee Handbook includes a specific section labeled "Disciplinary Action for Absenteeism," and providing for a verbal warning (which is what Woods received) after four absences from scheduled shifts. (Woods Dep., at Exh. 7 § 2.8.1.) Woods had incurred five absences in 30 days. This evidence confirms that the March 5 warning was fully consistent with Austal's absenteeism policy. Plaintiff's argument to the contrary lacks evidentiary support and cannot show pretext. In light of the foregoing, and Woods' failure to show that Austal failed to apply its absenteeism policies evenly to its employees, the Court finds that plaintiff has failed to make the necessary showing of pretext for his retaliation claim on the March 5 warning to withstand summary judgment scrutiny.

As for the March 28 warning, plaintiff presents no evidence undermining the reasonable factual basis of that disciplinary notice. Rather, Woods' sole asserted pretext contention is that the sharp wording of that warning is incongruous with Morris's approval of a $3.00 per hour pay raise for Woods approximately one week later. (Doc. 36, at 27.) This showing is insufficient to demonstrate the kinds of implausibilities or inconsistencies needed to show pretext. After all, plaintiff points to no evidence, and no reasonable basis for inferring, that the April 2008 pay increase was a reward for outstanding performance by Woods. To the contrary, Austal documents confirm that Woods received a raise for passing his restricted tests, which says nothing about his day-to-day performance. On this showing, plaintiff has not established genuine questions of fact that the March 28 warning amounted to unlawful retaliation for Woods' prior protected activity.

The analysis is much the same for plaintiff's retaliation claim relating to the March 2008 retesting procedure.[78] In an effort to show pretext, Woods points to evidence that Austal had

---

[78] Again, Austal's position is that two employees brought to its attention that Woods may have moved the weld during his March 19 restricted test. Austal investigated those reports by, among other things, reviewing a security tape of the test and consulting with a quality analyst. The security tape was inconclusive, but the quality analyst (Nick Cooper) reviewing the weld found "signs and indications that it was not welded in the proper position." (Doc. 30, Exh. (Continued)

already approved Woods' welds via visual inspection and x-ray, that Austal did not investigate any other employees' restricted weld test the way it did Woods', and that Austal has not proven "that it visually inspects welds multiple times." (Doc. 36, at 6.) None of these theories is availing for pretext purposes. It is uncontroverted that an x-ray inspection would not reveal whether Woods had rolled the weld. And Millender's initial visual inspection was made without knowledge that there was reason to question the integrity of the test. While plaintiff is correct that Austal did not habitually investigate other employees' restricted weld tests by reviewing security tapes and consulting a quality analyst, there is no evidence that Austal had ever received reports from witnesses (as it did in Woods' case) that the employee had moved the pipe. Faced with those reports, Austal had a perfectly valid, non-retaliatory reason to investigate further by reviewing tapes and having Cooper inspect the weld independently. Taken individually and collectively, plaintiff's arguments fail to "demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons." *Rioux*, 520 F.3d at 1278. Rather, plaintiff has simply quarreled with the wisdom of Austal's reasons, which is not sufficient. *See Wilson*, 376 F.3d at 1088. Defendant is entitled to summary judgment on this claim.

>        *3.      Termination.*

With respect to Woods' termination, plaintiff's pretext argument consists of the following: (i) he did not receive a warning or write-up contemporaneously with the welding problem observed on May 26; (ii) he contends that the line was purged and that he performed the procedure properly; (iii) his supervisors told him to continue welding despite the problem in the line; (iv) Mike Martin was not terminated or disciplined despite having done the same thing that Woods did at the same time; and (v) Austal's welding reference cards do not state that all welds must be closed. (Doc. 36, at 49-50.)

Plaintiff's pretext showing falls well short of the target. First, Austal's decision to terminate Woods the day after his deficient weld, without giving him a written warning the day of that welding error, is not probative as to pretext. Simply put, it does not logically call into

---

F, ¶ 5.) On that basis, Cooper – who had no idea that Woods had ever complained about race discrimination at Austal (*id.*, ¶ 6) – and Austal determined that Woods should take the test again.

question the veracity of Austal's explanation. Second, notwithstanding Woods' attempts to cast blame elsewhere, the fact remains that he performed a bad weld. That plaintiff quibbles with the employer's reasonable conclusion as to the root cause of that poor weld is not viable evidence of pretext. *See, e.g., Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."). Third, whether Woods' supervisors told him to continue welding despite a problem in the line is irrelevant because he was not fired for that reason and, besides, Woods presents no evidence that the decisionmaker was aware of that conversation. Fourth, defendant's evidence is that Martin dealt with the situation correctly, whereas Woods did not; therefore, defendant did not treat a similarly situated employee differently than Woods because Martin was not similarly situated as to that incident. And fifth, plaintiff offers no evidence and no reason to believe that the "Engineering Pipe Quick Reference Card" on which he relies (doc. 37, Exh. N) represents an exhaustive recitation of all Austal welding standards and requirements. Therefore, omission of a weld-closing requirement from that card is not probative of pretext.

Because plaintiff has come forward with neither direct evidence of retaliatory animus nor sufficient evidence of pretext to call into question the validity of Austal's stated reasons for terminating his employment, his retaliation claim as to that decision cannot withstand defendant's Rule 56 challenge.

## X.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.    Plaintiff's Motion to Strike Defendant's Declarations (doc. 35) is **denied** in its entirety, except that is **granted** with respect to certain enumerated portions of the Don Keeler Declaration (doc. 30, Exh. E) which are **stricken** for lack of personal knowledge;

2.    Defendant's Motion to Strike or for Extension of Time (doc. 42) is **granted in part, and denied in part**. All references to disparate pay comparators other than Mike Martin (who was timely disclosed) are **stricken** from pages 15 through 19 of Plaintiff's Opposition to Defendant's Motion for Summary Judgment (doc. 36). Defendant's Motion is **granted** as to that issue, but is **denied** in all other respects; and

3.     Defendant's Motion for Summary Judgment (doc. 29) is **granted in part, and denied in part**.  The Motion is **denied** with respect to (i) plaintiff's Title VII and Section 1981 pay discrimination claims relating to comparator Mike Martin; and (ii) plaintiff's Section 1981 retaliation claim relating to retaliatory job assignments.  In all other respects, the Motion is **granted** and all other claims brought by Woods are **dismissed with prejudice**.

DONE and ORDERED this 11th day of April, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE